No. 22-1736

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

STEPHEN DRIZOS,

Appellant,

v.

PNC INVESTMENTS LLC d/b/a PNC INVESTMENTS,

Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 2:19-cv-01651

---

BRIEF OF APPELLANT

---

Alec B. Wright, Esquire
Pa. ID No. 316657

Margaret S. Coleman, Esquire
Pa. ID No. 200975

O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorneys for Appellant

# **TABLE OF CONTENTS**

**STATEMENT REGARDING ORAL ARGUMENT** ...........................................1

**STATEMENT OF JURISDICTION** .........................................................2

**STATEMENT OF ISSUES PRESENTED** .............................................3

**STATEMENT OF RELATED CASES AND PROCEEDINGS** .........................4

**STANDARD OF REVIEW** ....................................................................5

**STATEMENT OF THE CASE** ................................................................6

   **I.  Factual Background** ...................................................................6

   **II.   Procedural History** .................................................................22

**SUMMARY OF THE ARGUMENT** .....................................................24

**ARGUMENT** ......................................................................................26

   **I.  A reasonable jury could conclude that PNC discriminated against Mr. Drizos because of his disability in violation of the ADA and PHRA** .............26

      **A. *Prima Facie* Case of Disability Discrimination**.................................28

      **B. Pretext**.................................................................................35

   **II.   A reasonable jury could conclude that PNC Investments retaliated against Mr. Drizos in violation of the ADA and PHRA because he requested a leave of absence to accommodate to alcoholism** ...........................................42

   **III.   A reasonable jury could conclude that PNC failed to accommodate Mr. Drizos' disability, and that it failed to engage in the interactive process** .....................................................................................44

   **IV.   The district court used the incorrect standard of proof to analyze Mr. Drizos' FMLA retaliation claims** ........................................................47

   **V. The district court did not address Mr. Drizos' claim that PNC Investments failed to reinstate him to an equivalent position when he returned from the First Leave of Absence** ......................................................52

**CONCLUSION**..................................................................................55

**CERTIFICATE OF COMPLIANCE WITH RULE 32A**..................................56

**CERTIFICATION OF BAR MEMBERSHIP** .................................................56

**CERTIFICATION OF TEXT OF E-BRIEF** ......................................................56

**CERTIFICATION OF VIRUS CHECK** ............................................................56

**CERTIFICATE OF SERVICE** ...........................................................................57

# TABLE OF AUTHORITIES

**Cases**

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575 (3d Cir. 2009) .................5

*Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713 (6th Cir.2003).....................48

*Coneen v. MBNA America Bank, N.A.*, 334 F.3d 218 (3d Cir. 2003) .....................29

*Cullen v. Select Medical Corporation*, 779 Fed. Appx. 929 (3d Cir. 2019) ...........27

*Egan v. Delaware River Port Auth.*, 851 F.3d 263, (3d Cir. 2017)........................48

*Flory v. Pinnacle Health Hosps.*, 346 F. Appx. 872 (3d Cir. 2009)........................30

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) ............................................... 28, 36

*Horn v. Thoratec Corp.*, 376 F.3d 163, 165 (3d Cir. 2004) .....................................5

*Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632 (W.D. Pa. 2018)...................47

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217 (3d Cir. 2007).........48

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3d Cir. 2012).... 48, 51

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .....................................27

*Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782 (3d Cir. 2000) .............................5

*Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478 (D.N.J. 2002)................53

*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81 (3d Cir. 1982)......................5

*Reedy v. Evanson*, 615 F.3d 197 (3d Cir. 2010) .......................................................5

*Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir. 2001) ...........................29

*Smith v. Davis*, 248 F.3d 249 (3d Cir. 2001) ..........................................................30

*Stokes v. City of Montgomery,* No. 2:07CV686-WHA, 2008 WL 4369247 (M.D.
    Ala. Sept. 25, 2008) .........................................................................................53

*Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3d Cir. 1999) ............. 27, 28, 44

*Thompson v. AT&T Corp.,* 2006 WL 89931 (W.D. Pa. Jan. 12, 2006)...................30

*Watkins v. J & S Oil Co.*, 164 F.3d 55 (1st Cir.1998) ............................................53

*Watson v. Southeastern Pennsylvania Transp. Auth.*, 207 F.3d 207 (3d Cir. 2000)
    ........................................................................................................................43

**Statutes**

29 U.S.C. § 2611, *et seq.*.......................................................................................22

29 U.S.C.A. § 2614 .................................................................................................52

42 U.S.C. § 12101, *et seq.*.....................................................................................22

42 U.S.C. § 12111 ...................................................................................................28

42 U.S.C. § 12112 ............................................................................................. 27, 44

43 Pa.C.S.A. § 951, *et seq.*....................................................................................23

**Rules**

F.R.C.P. 56(c)(2) ................................................................................5

**Regulations**

29 C.F.R. § 1630.2 ..................................................... 29, 44, 45
29 C.F.R. § 825.215 ...............................................................52
29 C.F.R. § 825.220 ..................................................... 47, 48

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Drizos requests oral argument because this appeal raises significant questions of law that would benefit from the opportunity for oral argument.

## **STATEMENT OF JURISDICTION**

On March 31, 2022, the district court issued a Memorandum and Opinion granting PNC Investments' Motion for Summary Judgment Appx2-12 and entered a Final Judgment Order in connection with the same. Appx13 Mr. Drizos filed a timely Notice of Appeal on April 20, 2022. Appx1 The district court had jurisdiction over this action pursuant to 28 U.S.C. § 451, 1331, 1343, and 1345, and upon the doctrine of pendant and/or supplemental jurisdiction over the state law claims. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## **STATEMENT OF ISSUES PRESENTED**

1.      Did the District Court err by examining and reviewing the record in the light most favorable to PNC Investments, as the moving party, and by resolving all reasonable inferences in its favor, on Mr. Drizos' discrimination claims under the ADA and PHRA?

2.      Did the District Court err by examining and reviewing the record in the light most favorable to PNC Investments, as the moving party, and by resolving all reasonable inferences in its favor, on Mr. Drizos' retaliation claims under the ADA and PHRA?

3.      Did the District Court err by examining and reviewing the record in the light most favorable to PNC Investments, as the moving party, and by resolving all reasonable inferences in its favor, on Mr. Drizos' failure to accommodate claims under the ADA and PHRA?

4.      Did the District Court err by examining and reviewing the record in the light most favorable to PNC Investments, as the moving party, and by resolving all reasonable inferences in its favor, on Mr. Drizos' retaliation claim under the FMLA?

5.      Did the District Court err by examining and reviewing the record in the light most favorable to PNC Investments, as the moving party, and by resolving all reasonable inferences in its favor, on Mr. Drizos' interference claim under the FMLA?

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

There are no cases or proceedings related to the instant appeal.

## <u>STANDARD OF REVIEW</u>

A district court's grant of summary judgment is subject to plenary review. *See Horn v. Thoratec Corp.*, 376 F.3d 163, 165 (3d Cir. 2004). Summary judgment is only proper when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law. *See* F.R.C.P. 56(c)(2). The court's role in reviewing a grant of summary judgment is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). If a reasonable jury could find in favor of the non-moving party, then "summary judgment cannot stand." *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010).

In determining whether a reasonable jury could find in favor of the non-moving party, this Court must view all the facts in the light most favorable to the non-moving party. *See id.* The non-moving party is "entitled to every reasonable inference that can be drawn from the record." *Id.* (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000)). "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).

# STATEMENT OF THE CASE

## I. Factual Background

Mr. Drizos became employed by PNC Bank, N.A. to work in the call center around November 2008, where he was never disciplined. Appx281, line 10 – Appx282, line 4. He was promoted to licensed banker in 2010, which he held through 2014. Appx282, line 5 – Appx283, line 15 and Appx284, line 21 – Appx285, line 8. He was never disciplined as a licensed banker. Appx284, line 21 – Appx287, line 5. As a licensed banker, he was awarded the Circle of Excellence and presented with an "awards trip" where he met the President of PNC Investments. Appx284, line 21 – Appx287, line 5. When he returned, he contacted Georgia Phillips (formerly known as Georgia Gertz) ("Phillips") who, at that time, was a regional sales manager for PNC Investments, about becoming a financial advisor. Appx286, line 7 – Appx287, line 25. Mr. Drizos was promoted to financial advisor in 2015. Appx286, line 7 – Appx287, line 25. Phillips was Mr. Drizos' direct supervisor in 2015, and Wendy O'Brien ("O'Brien") became his supervisor in 2016. Appx466 at ¶¶ 1-2. His main responsibility as a financial advisor was to grow revenue production for PNC Investments. Appx289, line 10 – Appx290, line 13.

Both before and after O'Brien became Mr. Drizos' supervisor, he worked remotely, when necessary, and she knew this fact and never complained or disciplined him for it. Appx466 at ¶ 3; *see also* Appx261, line 24 – Appx263, line

17.  As a commissioned financial advisor, Mr. Drizos regularly worked from home in the mornings to review and establish client matters prior to the chaos of the workday. Appx466 at ¶ 4. Everyone knew that he was always available by phone, email, and Skype when he worked remotely. Appx467 at ¶ 11. Everyone also knew that he could be reached at any time, not just during normal business hours. Appx467 at ¶ 11. The only expectation that was ever set for Mr. Drizos was that he be available by phone or email if he was not physically present at the branch. Appx148, line 20 – Appx149, line 16.

Unlike branch employees whose physical presence in the office was always required, Mr. Drizos would frequently work within and outside the office as necessary to follow leads, conduct sales, and ultimately increase revenue for the branch. Appx466 at ¶ 5. Branch employees rarely brought potential clients to meet with Mr. Drizos without any prior notification. Appx299, lines 8-23; *see also* Appx467 at ¶ 9. Unlike most branch employees, Mr. Drizos' job required that he work at night and early in the mornings (outside of normal business hours) to effectively carry out the responsibilities of his position, which he did. Appx467 at ¶¶ 6-7; *see also* Appx302, line 13 – Appx304, line 21. Mr. Drizos did not have a job description requiring him to be in an office physically from some specified point in time to another. Appx467 at ¶ 8; *see also* Appx301, lines 4-19.

In 2017, under O'Brien, Mr. Drizos was working at the Library Branch and the Lebanon Shops Branch for PNC Investments, and there was no expectation as to how much time he was supposed to spend at either Branch. Appx300, lines 3-25. Mr. Drizos had 350 to 370 clients per annum. Appx332, line 16 – Appx333, line 3. Mr. Drizos always grew investment revenue at the Lebanon Shops Branch as a financial advisor except when it remained equal in 2017 because of a leave of absence. Appx417, line 24 – Appx418, line 19; Appx467 at ¶ 12. The branch manager for the Lebanon Shops Branch was Amy Rhome-Smith ("Rhome-Smith"). Appx310, lines 16-18 and Appx311, lines 5-10. Mr. Drizos did not report to Rhome-Smith, and Rhome-Smith was an employee of an entirely different entity from PNC Investments. Appx310, lines 16-18 and Appx311, lines 5-10.

At all relevant times, O'Brien knew that Mr. Drizos was a recovered alcoholic. Appx267, lines 10-16; *see also* Appx466 at ¶ 2. He has been an active member in Alcoholics Anonymous for around 10 years, including during all times he was a financial advisor for PNC Investments. Appx267, lines 10 -16; *see also* Appx466 at ¶ 2. He lost his sobriety in 2017. Appx334, line 18 – Appx338, line 19; *see also* Appx768-769. From February 11 through March 9, 2017, Mr. Drizos took approved intermittent leave to treat his loss of sobriety (the "Intermittent Leave"). Appx334, line 18 – Appx338, line 19; *see also* Appx768-769.

During the Intermittent Leave, Mr. Drizos continued to work at least four hours per day, as well as on the weekends. Appx334, line 18 – Appx338, line 19; *see also* Appx468 at ℙ 19. Therefore, he was able to cover his entire client base, and no other financial advisors were necessary to assist him in reviewing managed accounts. Appx338, lines 2-25; *see also* Appx468 at ℙℙ 19-23. He specifically chose this form of rehabilitation so that he could continue to work for and manage his clients. Appx338, lines 2-25. In connection with the Intermittent Leave, Mr. Drizos took it upon himself to ensure that his accounts were appropriately handled, and he gave all income to another financial advisor on any new business that was generated through his branch while he was out. Appx533, line 14 – Appx534, line 15; *see also* Appx770-772; Appx468 at ℙℙ 19-23. Leading up to the Intermittent Leave, Mr. Drizos continued to work remotely, when necessary, and was not required to give O'Brien or Rhome-Smith his whereabouts or call ahead if he was not going to be in the office physically. Appx468 at ℙ 24.

In May 2017, Mr. Drizos decided that he needed more significant help to regain his sobriety and control his disability. Appx469 at ℙ 26. At the same time, he told O'Brien about his intention to take a formal and full-time leave of absence through inpatient rehabilitation. Appx469 at ℙ 27. After numerous discussions with various individuals in Human Resources ("HR"), as well as with O'Brien, Mr. Drizos began inpatient rehabilitation at Hazeldon Betty Ford Clinic in Florida

("Hazeldon") on May 30, 2017. Appx469 at ⁋ 28. From May 30 through August 30, 2017, Mr. Drizos took a formal leave of absence to attend inpatient rehabilitation at Hazeldon and Gateway Rehabilitation in Pittsburgh (collectively, the "First Leave of Absence"). Appx773-790; *see also* Appx791-796; Appx469 at ⁋ 29.

Mr. Drizos understood that the First Leave of Absence was covered by his short-term disability, long-term disability, and family medical leave. Appx469 at ⁋ 29. Mr. Drizos was *not permitted to work* during the First Leave of Absence, and he was dependent on others to manage his accounts, generate leads and referrals, and continue growing the revenue in the Lebanon Shops Branch. Appx469 at ⁋ 30. He returned to work on August 30, 2017, ready, willing, and able to resume his responsibilities as a financial advisor for PNC Investments. Appx469 at ⁋ 31.

But upon his return, he learned that only four of his managed accounts were reviewed while he was out, causing around 70 managed accounts to become delinquent.[1] Appx469 at ⁋ 31. O'Brien told him that it was his sole responsibility to bring these 70 or so managed accounts from delinquency as soon as possible.

---

[1] Notably, if a managed account is delinquent more than 90 days, then compliance is supposed to send an account termination letter to the client, thereby terminating the client-advisor relationship. Appx363, line 13 – Appx364, line 17. Neither O'Brien nor compliance terminated any managed account for Mr. Drizos during his employment with PNC Investments because of delinquency, even though some accounts remained delinquent for more than 90 days after O'Brien failed to review them during the First Leave of Absence. Appx470 at ⁋ 37.

Appx469 at ⁋ 32. The task of bringing that many accounts from delinquency was overwhelming and stress-ridden for Mr. Drizos, and it would have been even for someone who was not battling with addiction. Appx470 at ⁋ 33. Each review took a minimum of one and a half hours (i.e., over 100 hours of work), with some complex reviews taking longer. *See* Appx96 at ¶26. Mr. Drizos successfully reviewed all his managed accounts and brought them out of delinquency, all while continuing to abate his alcoholism, and continue to carry out all his other job responsibilities. Appx470 at ⁋ 33.

At all relevant times, O'Brien discussed with Lockard the difficulties involved and her frustrations in reviewing managed accounts when a financial advisor like Mr. Drizos took a leave of absence. Appx500, line 21 – Appx501, line 5. PNC Investments had no policy or procedures for completing managed account reviews for financial advisors who were out on a leave of absence. Appx547, lines 12-17. Managed account reviews are the process by which a financial advisor is obligated to review each clients' account under management to ensure that they were aware of progress, products, fees, and more. Appx332, lines 9-16. These reviews must occur at least once annually after the respective accounts come under management of PNC Investments. Appx332, lines 9-16. To this day, PNC Investments still does not have any policy or procedure to ensure that managed account reviews are completed on behalf of any financial advisor who takes a leave of absence. Appx546, lines 10-23.

When Mr. Drizos returned from the First Leave of Absence, the environment had changed drastically, and O'Brien had become noticeably cold toward him. Appx470 at ¶¶ 35-36. Mr. Drizos described it as being "toxic." Appx311, line 17 – Appx313, line 3. Most significantly, O'Brien demanded that Mr. Drizos adhere to weekly "check-ins" with her as soon as he returned from the First Leave of Absence. Appx470 at ¶ 37. O'Brien told him that he was the only financial advisor who was required to have weekly check-ins with her. Appx470 at ¶ 38. During these weekly check-ins, the environment became even more toxic. Appx470 at ¶ 39. Mr. Drizos also started believing that Rhome-Smith was keeping "tabs" on him and reporting information about him to O'Brien. Appx470 at ¶ 39.

Unbeknownst to Mr. Drizos, during the First Leave of Absence, O'Brien began creating a scheme whereby she planned to divest him of all his managed accounts if he ever took another leave of absence. Appx564, line 17 – 567, line 14; Appx797. To that end, in early October 2017, O'Brien recruited Anthony Caruso ("Caruso") to PNC Investments as a financial advisor. Appx548, line 18 – Appx549, line 4. And shortly thereafter, O'Brien formalized her plan to give Caruso all Mr. Drizos' managed accounts if he ever took another leave of absence. Appx564, line 17 – Appx567, line 14; Appx797. All the while, O'Brien continued to single-out Mr. Drizos and required him to perform weekly "check-ins." Appx470 at ¶ 37-39.

In an email dated January 26, 2018, O'Brien described her fear that Mr. Drizos might take another leave of absence, stating, "**Nevertheless it is a threat to my team's revenue performance this year but I can't yet count on Steve not going out again**." Appx566, lines 12-21 (emphasis added). Mr. Drizos always grew investment revenue at the Lebanon Shops Branch as a financial advisor except when it remained equal in 2017 because of his leave. Appx417, line 24 – Appx418, line 19; Appx467 at ¶ 12. Nevertheless, O'Brien was determined to divest him of his managed accounts because she feared he would take another leave of absence, stating, in part: "**I talked with ER about removing managed accounts from Steve so they would be covered should he go out again (they cannot be removed when an FA is out on a leave since they are a source of revenue each month) but they were not comfortable with me doing that**." Appx797 (emphasis added). When O'Brien terminated Mr. Drizos, she gave his entire book of business to Caruso at the Lebanon Shops Branch. Appx550, line 7 – Appx551, line 4.

On October 23, 2017, Mr. Drizos was involved in a serious car accident that caused him to be hospitalized for about 24 hours, or until about mid-day on October 24, 2017. Appx470 at ¶ 41. O'Brien told him that she knew about his car accident on the day that it happened. Appx470 at ¶ 42. On October 25, 2017, Mr. Drizos worked from home, which O'Brien knew about at the time, as he continued to

recover physically from the accident. Appx471 at ⁋ 43. He returned to the office on October 26, 2017. Appx471 at ⁋ 43.

O'Brien considered Mr. Drizos' physical absence to be excusable. Appx519, line 15 – Appx520, line 17.  Nevertheless, upon his return, O'Brien verbally told him that he was now required to notify both her and Rhome-Smith each time that he was not going to be in the office by 9:00 AM. Appx471 at ⁋ 44.[2] O'Brien also required him to continue to perform weekly check-ins with her. Appx471 at ⁋ 44.

Even though he was performing his duties in the same way as he had before the First Leave of Absence, Rhome-Smith constantly monitored his whereabouts at O'Brien's direction. Appx471 at ⁋ 46. Her behavior became so intrusive and disruptive that Mr. Drizos reported to O'Brien on multiple occasions his belief that he was suffering from workplace harassment. Appx471 at ⁋ 47; *see also* Appx257, lines 16-23. Mr. Drizos' location and whereabouts were checked so often after returning from the First Leave of Absence that, even during meetings with clients, he would receive multiple calls from Rhome-Smith and O'Brien looking for him. Appx303, lines 3-8. O'Brien either ignored his complaints or shifted his focus back to himself. Appx471 at ⁋ 48. O'Brien told Mr. Drizos that this new "call-out

---

[2] PNC Investments refers to this *ad hoc* requirement as a new "call-out procedure" that applied only to Mr. Drizos.

procedure" was being applied to him *because he took a prior leave of absence so that he would "stay on track."* Appx306, lines 10-15.

On January 25, 2018, O'Brien gave Mr. Drizos his first verbal warning for absences over this *ad hoc* "call-out procedure" after learning that he had obtained psychiatric treatment for alcoholism during the week of January 12, 2018. Appx798; Appx797. Thereafter, O'Brien placed Mr. Drizos on "heightened supervision". Appx799. Heightened supervision is a term used by PNC Investments to generally represent the idea of adopting a heightened supervision plan over an employee *who may engage in some type of investment fraud*. Appx568, line 23 – Appx570, line 23. Even though there was no indication that Mr. Drizos would engage in any such conduct, he was officially placed on heightened supervision around February 9, 2018. Appx799; *see also* Appx570, lines 12-23. Heightened supervision plans are rare. Appx572, lines 3-15. Under the heightened supervision plan, O'Brien directed PNC Investments to secretly check with branch and regional managers to monitor his attendance, participation, and kept appointments, looking for production spikes, randomly calling customers, checking for unexplained product changes, enhancing review of his accounts to see if he was trustee or beneficiary, and reviewing brokerage accounts for deposits and withdrawals. Appx800-801.

At least as early as January 26, 2018, O'Brien asked Lori Lockard ("Lockard"), Venera Foti ("Foti"), and Gregory Suhanic ("Suhanic") to provide her

with reasons and/or ways in which she could justify treating Mr. Drizos differently than other financial advisors. Appx800-801. O'Brien specifically asked them for assistance in justifying the fact that she was isolating and singling him out because he took the First Leave of Absence. Appx800-801. O'Brien wrote to them about Mr. Drizos, stating, in part, "Jeff/Lori/Venera: *I'm looking for insight into specific intention for this call, if any, that would be different or would distinguish this connection from the typical connection I have with FAs regularly*." Appx800-801. O'Brien admits that she placed him under greater scrutiny and oversight after he returned from the First Leave of Absence to make his professional career more constrictive. Appx579, lines 2-11. The only corrective actions ever taken against Mr. Drizos for absences or tardiness occurred *after* he returned from the First Leave of Absence, and *after* O'Brien placed him on an *ad hoc* "call-out procedure." *See generally* Appx466-473.

According to Rhome-Smith, beginning in early 2018, O'Brien directed her to report all of Mr. Drizos' whereabouts. Appx206, line 17 – Appx207, line 17. O'Brien did not tell Rhome-Smith why she was required to report Mr. Drizos' whereabouts, only that it was "important." Appx206, lines 17-25. Mr. Drizos did not report to Rhome-Smith, and Rhome-Smith was an employee of an entirely different entity from PNC Investments. Appx310, lines 16-18 and Appx 311, lines 5-10.

Despite this directive, the only time in over two years that Rhome-Smith reported to O'Brien that Mr. Drizos was not in the office occurred on May 17 and 18, 2018, when Mr. Drizos was out of the office using vacation days. Appx765; *see also* Appx516, line 2 – Appx517, line 6 (stating that she was good about documenting any time that Rhome-Smith reported absences or tardiness related to Mr. Drizos). Rhome-Smith had access to Mr. Drizos' calendar, so she would have seen ahead of time that he took those days off as vacation days. Appx389, lines 5-14. O'Brien disregarded Rhome-Smith's attendance report because Mr. Drizos' appropriately used and reported his intention to use vacation time in advance for those days. Appx765 (stating that, "Steve sent me an email early Friday morning saying he was taking a sick day but would be on his laptop doing things from home. Steve is not scheduled in Amy's branch on Fridays so he doesn't need to let her know, although it would be a smart courtesy since he frequently works there even though not scheduled to be there on that day. The Thursday and Friday Amy mentions below were scheduled vacation days (he went to DC with family.")). Rhome-Smith never tracked and/or reported Mr. Drizos' on her own volition until O'Brien told her to do so. Appx208, line 19 – Appx209, line 1. Rhome-Smith never reported another time that Mr. Drizos was absent or tardy in more than two years. Appx765; Appx516, line 2 – Appx517, line 6.

Beginning in early or mid-May 2018, Mr. Drizos disclosed to O'Brien his intention to take another leave of absence to further address his alcoholism. Appx471 at ¶ 52; *see also* Appx802 (establishing conversation between O'Brien and Lockard on May 24, 2018, during which Lockard was already under the impression that Mr. Drizos might be out on another leave of absence). Mr. Drizos disclosed this intention to O'Brien multiple times in May 2018. Appx471 at ¶ 53. He also explained to O'Brien during those disclosures that it would take him a few weeks to determine how he could take this leave of absence, while explaining that he needed to reserve bed space, determine what leave was available to him, and organize his practice before he took it. Appx472 at ¶ 54. When he told O'Brien that he intended to take another leave of absence, she "sighed" out loud and did not engage in the conversation. Appx472 at ¶ 55. O'Brien became noticeably upset and frustrated, and she never spoke with Mr. Drizos about his intention to take another leave of absence. Appx472 at ¶¶ 55-56. O'Brien distanced herself from him after he reported his intention to take another leave. Appx472 at ¶¶ 55-56.[3]

---

[3] O'Brien claimed that Mr. Drizos violated the alleged "call-out procedure" when he was late on April 11, 2018, because his daughter was born on April 10, 2018. Appx905 at ¶ 13; Appx471 at ¶ 49-51. O'Brien and Rhome-Smith knew that his daughter was born and therefore he was not coming in. Appx471 at ¶ 49-51. O'Brien also knew that he was expecting a child and that he was not going to take formal paternity leave as offered through his employment. Appx471 at ¶ 50. O'Brien understood and appreciated that he was not going to take paternity leave and that he was going to continue to work instead, telling him that she would be flexible if he needed to take time off to be with his newborn child. Appx471 at ¶ 51. Mr. Drizos

On May 24, 2018, Lockard recorded a conversation with O'Brien about Mr. Drizos. Appx766. The handwritten note makes no mention that Mr. Drizos may have violated some alleged "call-out procedure." Appx766. Instead, Lockard, through her conversation with O'Brien, described Mr. Drizos' positive improvement as follows: "Managed reviews are getting done. Improvement seen. No missed appts. RSO + partners giving positive feedback. Wendy will speak to Stephen about areas of improvement and need for improvement to continue. If issues continue will move to written warning." Appx766. No mention is made as to "issues," but all information received by Lockard was coming only from O'Brien. Appx766.

Mr. Drizos took sick days on May 31and June 1, 2018, and sent the following email to O'Brien, Lockard, and Nicole Ferri (his administrative assistant) at 10:48 a.m. on May 31, 2017: "I am taking a personal day today the baby is now sick and I need to be home to help. I have no appointments scheduled but will be working from home when I can. Nicole is available." Appx767. O'Brien claimed that the foregoing notice was violative of her "call-out procedure" for him and therefore she issued a final written warning for it on June 8, 2018. Appx472 at ¶ 57. O'Brien ignored her

---

also informed Rhome-Smith in advance that he would not be in the office on April 11, 2018, or at least that he had been working from home that morning. Appx764. Mr. Drizos also informed O'Brien that he was using a sick day for his daughter. Appx764. Mr. Drizos was in contact with Rhome-Smith throughout the day and was obviously available by phone or email should the same be necessary. Appx764. Nevertheless, O'Brien claimed he violated her "call-out" procedure.

prior agreement with Mr. Drizos to allow him leeway in caring for his daughter in lieu of the formal parental leave that he could have taken. Appx471 at ¶¶ 49-51.

Either Mr. Drizos or his assistant, Ferri, communicated his whereabouts to O'Brien and Rhome-Smith during each of his alleged "absences," and they were always aware of where he was and what he was doing. Appx472 at ¶ 58. At no time did Mr. Drizos "fail to report to work," as he was either working from home, in the hospital, taking care of his newborn child, or attending to the arrangements that were necessary for his intended leave of absence in 2018. Appx472 at ¶ 59; *see also* Appx406, lines 14-25. Mr. Drizos formally advised O'Brien that he intended to take another leave of absence for alcoholism as soon as she issued the final written warning. Appx472 at ¶ 57.

O'Brien terminated him thereafter on June 28, 2018, claiming that he was not physically present on June 25, 2018, and that he did not notify her that he was working from home that day. Appx406, lines14-25. At the time of his termination, Mr. Drizos had not yet confirmed bedspace or his reservation for inpatient rehabilitation. Appx472 at ¶ 60. O'Brien told him that he could contact HR and see if he could still receive short-term disability for a leave of absence upon his termination, which he did the next day. Appx472 at ¶ 61. He also formally requested information about family medical leave at that time. Appx472 at ¶ 61. Mr. Drizos was surprised by his termination because he was "on [his] way to get help," and

O'Brien knew that he was making the arrangements. Appx411, line 20 – Appx412, line 4.

Mr. Drizos was later denied all benefits because he had lost his insurance when he was terminated. Appx473 at ¶ 62. Nevertheless, he checked into inpatient rehabilitation as originally intended at his own cost/expense. Appx473 at ¶ 62. Mr. Drizos remains sober to this day after successfully completing 30 days of inpatient rehabilitation treatment in July 2018. Appx473 at ¶ 63; *see also* Appx272, line 22 – Appx273, line 9.[4]

O'Brien was aware that PNC Investments allowed Mr. Drizos' to use FMLA to cover his previous absences. Appx768-769. Lockard, who assisted in the heightened supervision plan against Mr. Drizos, *see* Appx 671, lines 6-24, never independently investigated any of the allegations that O'Brien made against him to justify his termination. Appx677, lines 4-12. Mr. Drizos was never contacted by Lockard to discuss any attendance-type issues that may have been raised by O'Brien prior to his termination. Appx678, lines 17-25. Lockard knew that Mr. Drizos was

---

[4] Mr. Drizos subsequently learned that he had sufficient days on which he could use short-term disability (combined with other leave days like vacation and occasional absence days) where he could have successfully entered inpatient rehabilitation before he was terminated. Appx472 at ¶ 58; *see also* Appx803-805 (stating that "[a]s of [July 3, 2018], and prior to the beginning of your leave date, you have 200 hours and 38 minutes of unpaid leave remaining under the Family & Medical Leave Act for the current 12 month period [sic], which is measured backwards from the first date leave was taken"); Appx806 (informing Mr. Drizos that had exhausted his Family Medical Leave and that his next eligibility date would be February 27, 2018).

dealing with alcoholism, yet she neither met with him nor took any other steps to interact with him to determine if an accommodation was necessary or appropriate. Appx689, line 16 – Appx691, line 23 and Appx692, line 12 – Appx693, line 3; *see also* Appx798.

Lockard is familiar with the interactive process for accommodating an employee's disability. Appx698, line 14 – Appx699, line 10. She admits that she never engaged in the interactive process with Mr. Drizos. Appx700, line 10 – Appx701, line 16. She admits that O'Brien attempted to move some of Mr. Drizos' managed accounts to other financial advisors after he returned from the First Leave of Absence. Appx715, line 20 – Appx716, line 21; *see also* Appx807-809.

Mr. Drizos never used any substances while at work and there was never any evidence that he was impaired while at work. Appx691, line 24 – Appx692, line 11. He never missed a client meeting without rescheduling it in advance. Appx468 at ¶ 18. He notified O'Brien that he intended to take another leave of absence as early as the beginning of May 2018. Appx471-472 at ¶¶ 52-57.

## II.    Procedural History

Mr. Drizos initiated this action by filing a Complaint on December 20, 2019. Appx910-919. The Complaint asserted causes of action for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, as amended, the Family Medical and Leave Act, 29 U.S.C. § 2611, *et seq.*, as well the Pennsylvania Human

Relations Act, 43 Pa.C.S.A. § 951, *et seq. See id.* PNC Investments filed its Answer and Affirmative and Other Defenses to Plaintiff's Complaint on March 17, 2020. Appx920-941.

Following discovery, PNC Investments filed its Motion for Summary Judgment, Brief in Support of Motion for Summary Judgment, Concise Statement of Material Facts, and Appendix on June 23, 2021. Appx14-16, 17-42, 43-63. Mr. Drizos filed his Brief in Opposition to Motion for Summary Judgment, Response to Concise Statement of Material Facts, and Appendix on August 19, 2021. Appx. Appx64-89, 90-123, 124-809. PNC Investments filed its Reply in Support of Motion for Summary Judgment, Reply to Response to Concise Statement of Materials Facts, and Appendix in Support of Reply in Further Support of Motion for Summary Judgment on September 16, 2021. Appx810-816, 817-899, 900-909.

The district court granted PNC Investments' Motion for Summary Judgment on March 31, 2022. Appx2-12. On the same day, the District Court entered a Final Judgment Order pursuant to Rule 58 of the Federal Rules of Civil Procedure. Appx13. Mr. Drizos filed a timely Notice of Appeal on April 20, 2022. Appx1.

## SUMMARY OF THE ARGUMENT

According to PNC Investments, Mr. Drizos was an exemplary and high-performing employee until he went out on the First Leave of Absence to treat alcoholism and his absence caused O'Brien the headache and frustration of managing his accounts while he was out. That frustration, coupled with her fear that an alcoholic like Mr. Drizos could not successfully recover without causing her yet another headache from a second leave of absence, drove her decision-making over him from then on. She allowed 70 or more of his accounts to become delinquent while was on leave and unable to work. She also attempted to remove his managed accounts while he was still employed and, when that was unsuccessful, she developed a plan to get his book of business if he ever took another leave.

When Mr. Drizos returned from the First Leave of Absence, O'Brien immediately implemented weekly "check-ins" with her, which was something that never existed previously, and that no other financial advisor was required to do. O'Brien then used an excusable absence to create an *ad hoc* "call-out procedure" for Mr. Drizos, which never existed previously, and that no other financial advisor was required to follow.  O'Brien also implemented a "heightened supervision" plan against Mr. Drizos, causing him and his accounts to be secretly monitored to ensure that he was not embezzling money to feed his addiction when there was absolutely no indication that he would ever do that.

Ultimately, the increased stress from bringing 70 plus accounts from delinquency, the increased scrutiny, the *ad hoc* procedures, the toxicity, and the prejudice became too much to bear, and Mr. Drizos sought additional leave to regain his sobriety yet again. His request for another leave of absence was the trigger to his eventual demise. O'Brien thus capitalized on her prior course of discriminatory conduct and claimed *in flagrante delicto* over the *ad hoc* "call-out procedures." Mr. Drizos was thereafter terminated without another word. A reasonable jury could conclude that the real reason for his termination was his disability and lawful request for another leave of absence.

# **ARGUMENT**

## I.    **A reasonable jury could conclude that PNC discriminated against Mr. Drizos because of his disability in violation of the ADA and PHRA**

The district court did not analyze whether the record establishes a prima facie case of disability discrimination under either the ADA or the PHRA. The district court simply accepted PNC Investments' contention that the *ad hoc* "call-out procedure" it created for Mr. Drizos when he returned from the First Leave of Absence was legitimate and nondiscriminatory. The district court ignored the record evidence from which a reasonable jury could conclude that O'Brien feared Mr. Drizos' alcoholism, and that her treatment of him was prejudiced by that fear. In doing so, the district court ignored the restrictions, heightened supervision, and *ad hoc* procedures that were applied only to Mr. Drizos *because* he took a leave of absence. The district court also ignored the scheme that O'Brien developed to divest Mr. Drizos of his accounts *because* he took a leave of absence and *because* he might have taken another. But to view the facts in the light most favorable to Mr. Drizos as required at summary judgment, it is necessary to analyze his *prima facie* case before turning to the pretext behind what PNC Investments proffers as its legitimate, nondiscriminatory reason for terminating him.

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to … discharge of employees … and other terms, conditions, and privileges of employment." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 305 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(a)). Disability discrimination claims are analyzed under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is a three-step process. *See Cullen v. Select Medical Corporation*, 779 Fed. Appx. 929, 931 (3d Cir. 2019). A plaintiff first needs to establish a prima facie case. *Id.* A plaintiff establishes a prima facie case of disability discrimination by showing that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor*, 184 F.3d at 306 (citations omitted).

If the plaintiff makes a prima facie case, "the burden shifts to the employer to provide a legitimate non-discriminatory reason for its conduct." *Cullen*, 779 Fed. Appx. at 931 (citation omitted). "If the employer provides such a reason, then the burden shifts back to the plaintiff to convince the factfinder both that the employer's proffered explanation was false [that is, a pretext] and that discrimination was the real reason for the adverse employment action." *Id.* (citations and quotations

omitted) (alteration in original). "[A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

## A.    *Prima Facie* Case of Disability Discrimination

As stated above, the district court failed entirely to address whether the record establishes a *prima facie* case of disability discrimination. The facts supporting a *prima facie* case, however, are important to the entire case. In analyzing whether such a *prima facie* case exists, this Court should look only to whether Mr. Drizos was qualified to perform the essential functions of his job, with or without reasonable accommodations from PNC Investments, because PNC Investments does not dispute that he is a disabled person under the ADA or that he suffered an adverse employment action when he was terminated.

A qualified individual under the ADA is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Taylor*, 184 F.3d at 305 (quoting 42 U.S.C. § 12111(8)). "'Essential functions' must be 'fundamental' to one's job and not simply 'marginal.'" *Coneen v. MBNA America Bank, N.A.*, 334

F.3d 218, 326 (3d Cir. 2003) (citation omitted). "The inquiry into whether a job requirement is essential to one's job is a **factual determination** that must be made on a **case by case basis** [based upon] *all* relevant evidence." *Id.* (citations omitted) (some emphasis added and some in original). A non-exhaustive list of relevant evidence may include: (i) the employer's judgment, (ii) written job descriptions, (iii) amount of time spent performing the function, (iv) consequences of not performing the function, (v) collective bargaining agreement, (vi) past work experience, and (vii) current work experience. *Id.* at 327-28; *see also* 29 C.F.R. § 1630.2(N)(1); *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3d Cir. 2001). "[T]he employee's actual experience is also relevant to the inquiry." *Id.* at 326 (quoting *Skerski*, 257 F.3d at 278).

The only "essential function" at issue is PNC Investments' creation of an *ad hoc* "call-out procedure," that applied only to Mr. Drizos, after he returned from the First Leave of Absence and was involved in a serious car accident.[5] PNC

---

[5] The district court claims that attendance itself is a red herring in this case because Mr. Drizos' "termination is not related to his work from home, but rather it is about [his] failure to adhere to PNC [Investments'] call-out procedures." Appx6. In other words, the district court did not take issue with the fact that PNC Investments did or did not allow Mr. Drizos to work remotely when he wanted, but instead asserts that according to the *ad hoc* "call-out procedures" that were implemented against him, he was simply required to tell O'Brien and/or Rhome-Smith that he would be working from home or otherwise taking a day off before doing so. Because he either worked from home or took a day off work (via vacation day, sick day, childcare, FMLA, or otherwise) and did not notify O'Brien and/or Rhome-Smith before 9:00

Investments offers no documented evidence of what this alleged "call-out procedure" entailed. And it offers no evidence that the same "call-out procedure" existed for any financial advisor, either before or after Mr. Drizos took his First Leave of Absence, other than O'Brien's testimony.

It only offers—again, through O'Brien's testimony alone—that she verbally told Mr. Drizos that he was required to perform weekly check-ins with her, and to call ahead of time and notify her or Rhome-Smith if he was not going to be in the office by 9:00 a.m. Both restrictions were imposed almost immediately after he returned from the First Leave of Absence and applied only to Mr. Drizos. Because of the factual context as to why this "call-out procedure" was implemented against Mr. Drizos in the first place—i.e., the fact that he took leave to address his

---

a.m., the district court assumed the legitimacy of these *ad hoc* "call-out procedures" and thus decided his termination was lawful.

To the extent this Court views the *ad hoc* "call-out procedures" as being attendance-related, then it is important to note that attendance ***can*** be an essential function of an employment position in the Third Circuit. *See e.g., Flory v. Pinnacle Health Hosps.*, 346 F. Appx. 872, 876 (3d Cir. 2009) (holding that unexcused absenteeism did not disqualify the employee where prior absences under various supervisors went undisciplined and performance was never significantly impacted by excessive absenteeism); *Smith v. Davis*, 248 F.3d 249, 251-52 (3d Cir. 2001) (holding that factual disputes at summary judgment precluded granting the defendant summary judgment as to whether the plaintiff, an alcoholic, was unqualified due to excessive absenteeism); *Thompson v. AT&T Corp.*, 2006 WL 89931, at *5-6 (W.D. Pa. Jan. 12, 2006) (holding that sufficient evidence existed for a reasonable factfinder to conclude that the plaintiff was qualified to perform the essential functions of her job, despite numerous disciplines over excessive absenteeism).

alcoholism—it cannot be a legitimate and nondiscriminatory essential function of his job as a financial advisor. Moreover, it reasonable to infer under the circumstances that this serious car accident was treated differently because it involved Mr. Drizos and PNC Investments knew about his alcoholism. It cannot be seriously disputed that a non-alcoholic employee who is involved in a serious car accident and hospitalized would have been placed on the same *ad hoc* "call-out procedure."

PNC Investments offers no other argument as to why Mr. Drizos might otherwise be unqualified as a financial advisor, nor does the district court address one. A reasonable jury could conclude that PNC Investments' decision to implement restrictions, new procedures, and heightened supervision against Mr. Drizos when he returned from the First Leave of Absence were discriminatory and/or retaliatory. At summary judgment, PNC Investments pivoted away from the undisputed fact that it previously permitted Mr. Drizos to work remotely without "calling out" or checking in and asserted that attendance became an essential function of his position after he returned from the First Leave of Absence because an advisor may need to meet with unscheduled customer referrals or scheduled client meetings.

PNC Investments, however, made no argument as to why following *ad hoc* "call-out procedures" or conducting business outside of the branch rendered him unqualified as a financial advisor when it had previously permitted him to do it, and

when his doing so did not negatively impact his performance. To be sure, PNC Investments did not offer any evidence of a written job description or the amount of time that a commissioned financial advisor was required to be at the office (and there is no evidence that financial advisors had set hours where they needed to be at the branch). PNC Investments likewise made no argument that physical presence in the branch by a financial advisor is the sole reason—or even a significant reason—that the position exists. Of course, the district court did not address these facts either.

Contrary to the district court's favorable view that PNC Investments implemented all these restrictions against Mr. Drizos without discriminatory intent, the record evidence establishes that Mr. Drizos' physical presence in the office every day for some (unspecified) amount of time was not essential to performing the responsibilities of a financial advisor. Both before and after O'Brien became Mr. Drizos' supervisor, he worked remotely, when necessary, and she knew this fact and never complained or disciplined him for it. *See* Appx108, ⁋ 64. Mr. Drizos' practice as a commissioned financial advisor was to regularly work from home in the mornings to review and establish client matters prior to the chaos of the workday. *See* Appx108 at ⁋ 65. Unlike branch employees whose physical presence in the office was always required, Mr. Drizos would frequently work within and outside the office as necessary to follow leads, conduct sales, and ultimately increase revenue for the branch. *See* Appx108 at ⁋ 67. Also, unlike most branch

employees, Mr. Drizos' job required that he work at night and early in the mornings (outside of normal business hours) to effectively carry out the responsibilities of his position. *See* Appx108-109 at ¶ 67-69. Mr. Drizos was never told that his job description and/or responsibilities required him to be in an office physically from some point in time to another. *See* Appx109 at ¶ 70. In 2017, for example, under O'Brien, Mr. Drizos was working at the Library Branch and the Lebanon Shops Branch for PNC Investments, and there was no expectation as to how much time he was supposed to spend at either Branch. *See* Appx109 at ¶ 71.

Mr. Drizos was "required" for the first time as a financial advisor to adhere to a previously nonexistent "call-out procedure" only shortly after returning from the First Leave of Absence. *See* Appx112 at ¶¶ 91-92. According to Mr. Drizos, upon his return, the environment had changed drastically, and O'Brien had become noticeably cold toward him, which he described as "toxic." *See* Appx111 at ¶ 90. Almost as soon as Mr. Drizos returned from his full-time leave of absence, O'Brien demanded that he was now required to adhere to weekly "check-ins" with her. *See* Appx112 at ¶ 91; *see also* Appx112 at ¶ 92 (stating that Mr. Drizos asked O'Brien if he was the only financial advisor who was required to have weekly check-ins with her, and she responded, "yes"). During these weekly check-ins, the environment became even more toxic, and Mr. Drizos also began to believe that

Rhome-Smith was keeping "tabs" on him and reporting information about him to O'Brien, which ultimately turned out to be true. *See* Appx112 at ¶ 93.

Mr. Drizos' responsibility as a financial advisor was to grow revenue production for PNC Investments. *See* Appx107 at ¶ 59. As part of revenue production, branch employees rarely brought potential clients to meet with Mr. Drizos in the office without any prior notification. *See* Appx108 at ¶ 60. When Mr. Drizos worked remotely, everyone knew that he was always available my phone, email, and Skype, and everyone knew that he could be reached at any time, not just during normal business hours. *See* Appx108 at ¶ 66.

There is no evidence that Mr. Drizos ever missed a prescheduled client appointment, or that he missed one of those rare opportunities where an unscheduled potential client was brought to his office, and he was nowhere to be found. Despite the great many benefits that financial advisors bring to families through diligent investment strategies and wealth management planning, they are also commission-based salesman whose essential function is to sell wherever and whenever they can. That means that financial advisors are permitted to meet clients where they are, attend events during normal work hours, or do whatever else is required to grow assets under management and sell institutional products for their employer. Sitting in a chair from 9:00 a.m. to 5:00 p.m. was never required until Mr. Drizos took the First Leave of Absence, and it is not something that was ever required of other

financial advisors. The same can be said about the *ad hoc* "call-out procedures" in this case. The only thing that changed with respect to O'Brien's handling of Mr. Drizos was the fact that he took and returned from leave for alcoholism and, while he was gone, she was required to ensure that his approximately 350 accounts did not become delinquent, which she failed to do.

## B.    Pretext

A reasonable jury could infer that O'Brien implemented the alleged "call-out procedure," as well as the weekly check-ins and heightened supervision, out of fear and prejudice that Mr. Drizos was an alcoholic that could only stay sober for so long, despite treatment. O'Brien's fear was exacerbated by her concern that if Mr. Drizos took another leave of absence, then she would be left with dozens and dozens of unreviewed accounts like she was before because PNC Investments had nothing in place to review those accounts while a financial advisor was on leave. To abate that fear, O'Brien developed a scheme to divest Mr. Drizos of all his accounts if he ever took another leave of absence. She even attempted to take Mr. Drizos' managed accounts away from him before he left on another leave of absence but was told she could not do so. She determined never to frustrate herself again because of his disability.

Mr. Drizos may carry his burden in establishing pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons such that a reasonable fact-finder could rationally find them unworthy of credence, leading to the inference that the proffered reason was not the actual motivation for the employer's action." *Fuentes*, 32 F.3d at 764-65. As described in detail above, what was previously tolerated for years in terms of Mr. Drizos' attendance was no longer tolerated after he took the First Leave of Absence. But that critical fact is not the only one that discredits PNC Investments' proffered reason for his termination, or that circumstantially proves that discrimination was more likely than not a motivating cause of his termination. There are the weekly check-ins, the *ad hoc* "call-out procedures," and the heightened supervision as well. There is also the fact that all those things were put in place to ensure that Mr. Drizos "stayed on track" after the First Leave of Absence.

Moreover, when Mr. Drizos returned ready, willing, and able to resume his responsibilities as a financial advisor for PNC Investments on August 30, 2017, he quickly learned that O'Brien failed to perform 70 or so managed accounts reviews, causing them to become delinquent. *See* Appx111 at ℙ 87. *At least one of Mr. Drizos' managed accounts became delinquent each day that he was out on leave*. Upon learning this information, O'Brien told Mr. Drizos that it was his responsibility to bring these accounts out from delinquency. *See* Appx111 at ℙ 88. The task of bringing that many accounts from delinquency was overwhelming and stress-ridden for Mr. Drizos, and it would have been even for someone who was not battling with

addiction, which is why O'Brien failed to do it in the first place even though she had multiple advisors attempting to help. *See* Appx111 at ⁋ 89. The process of bringing those accounts from delinquency took considerable time, effort, and resiliency from Mr. Drizos to accomplish. *See* Appx111 at ⁋ 89. O'Brien was the manager of dozens of financial advisors within PNC Investments. She could have ensured that these accounts were reviewed when she knew that Mr. Drizos would be unable to review them while he was on leave, but she simply chose not to.

The environment had also changed drastically when Mr. Drizos returned from the First Leave of Absence, and O'Brien had become noticeably cold toward him, which he could only describe as "toxic." *See* Appx111 at ⁋ 90. Almost as soon as Mr. Drizos returned, O'Brien demanded that he was now required to adhere to weekly "check-ins" with her, which occurred *before* any of the alleged "call-out procedure" violations that PNC Investments alleges caused his termination. *See* Appx112 at ⁋ 91. Mr. Drizos asked O'Brien if he was the only financial advisor who was required to have weekly check-ins with her, and she responded, "yes." *See* Appx112 at ⁋ 92.

During these weekly check-ins, the environment became even more toxic, and Mr. Drizos also began to believe that Rhome-Smith was keeping "tabs" on him and reporting information about him to O'Brien (which ultimately turned out to be true). *See* Appx112 at ⁋ 93. Again, all this was occurring before any of the attendance

issues that PNC Investments alleges. At all relevant times, O'Brien discussed with Lockard the difficulties involved and her frustrations in reviewing managed accounts when a financial advisor like Mr. Drizos took a leave of absence. *See* Appx113 at ¶ 104. O'Brien thus placed that burden squarely and solely onto Mr. Drizos, the person who caused her frustrations by taking a medical leave of absence. And it only got worse from there when she considered that he might take another leave in the future.

To that end, when Mr. Drizos was out on the First Leave of Absence, O'Brien began creating a scheme whereby she planned to divest him of his managed accounts if he took another leave. *See* Appx113 at ¶ 105. She formalized that plan only a month or two after he returned, deciding to give Mr. Drizos' accounts to Caruso, who she personally recruited. *See* Appx114 at ¶¶ 106-107.[6] As O'Brien stated, "Nevertheless it is a threat to my team's revenue performance this year but I can't yet count on Steve not going out again." *See* Appx114 at ¶ 109. O'Brien knew and anticipated that Mr. Drizos' disability might cause him to take another leave of absence. O'Brien even proactively tried to take his managed accounts before he took another leave of absence, which was both discriminatory and retaliatory in nature. O'Brien stated, "**I talked with ER about removing managed accounts from Steve so they would be covered should he go out again (they cannot be removed when**

---

[6] Ultimately, after Mr. Drizos was terminated by O'Brien, she gave his entire book of business to Caruso at the Lebanon Shops Branch. *See* Appx114 at ¶ 108.

**an FA is out on a leave since they are a source of revenue each month) but they were not comfortable with me doing that**." *See* Appx114 at ⁋ 110 (emphasis added).

On October 23, 2017, Mr. Drizos was involved in a serious car accident that caused him to be hospitalized for about 24 hours, or until about mid-day on October 24, 2017. *See* Appx114 at ⁋ 111. O'Brien told Mr. Drizos that she had known about his car accident on October 23, 2017, the day that it happened. *See* Appx114 at ⁋ 112. She also admitted that a serious car accident like the one in which Mr. Drizos was involved would excuse any financial advisor from work, including him. But when he returned to the office, O'Brien told him that he was now required to notify both her and Rhome-Smith each time that he was not going to be in the office by 9:00 a.m., and that he was to continue to perform weekly check-ins with her. *See* Appx115 at ⁋ 114. A reasonable jury could infer that O'Brien implemented this added restriction—which she admits was excusable for anyone—because she feared his alcoholism, his prior leave of absence, and his "staying on track," which might cause a future leave of absence.

From that point, Rhome-Smith's behavior—at O'Brien's behest—became so intrusive and disruptive that Mr. Drizos unwittingly reported to O'Brien on multiple occasions his belief that he was suffering from workplace harassment because of Rhome-Smith. *See* Appx115 at ⁋ 116. Mr. Drizos' location and whereabouts were

checked so often after his second leave of absence that, even during meetings with clients, he would receive multiple calls from Rhome-Smith and O'Brien looking for him. *See* Appx115 at ⁋ 117. O'Brien either ignored Mr. Drizos when he complained or told him to focus on himself, thereby diverting his attention away from what she was doing behind the scenes to target him and his book of business. *See* Appx115 at ⁋ 118. O'Brien also told Mr. Drizos that this new procedure for constantly reporting his whereabouts was *because of* the First Leave of Absence so that he would "stay on track," making no reference to attendance concerns or formal discipline of any kind. *See* Appx115 at ⁋ 119.

O'Brien gave Mr. Drizos his first verbal warning for violating the *ad hoc* "call-out procedure" *after* learning that he obtained mental health treatment at a psychiatric care center during the week of January 12, 2018. *See* Appx115 at ⁋ 120. Her response to his psychiatric care was likely motivated by her frustrations with medical leaves of absence, or the possibility that Mr. Drizos might again take medical leave. Shortly thereafter, Mr. Drizos was placed on a heightened supervision plan so that he could be monitored by numerous individuals for potential investment fraud, even though there was no indication that there was likelihood that the same might occur. *See* Appx116 at ⁋⁋ 121-126. O'Brien even schemed how she could explain justifying increasing the rate at which Mr. Drizos was required to report his whereabouts to her and others. *See* Appx116-117 at ⁋⁋ 126-128.

The only corrective actions ever taken against Mr. Drizos for absences or tardiness was because of the discriminatory implementation of things like the *ad hoc* "call-out procedure" that never previously existed. *See* Appx117 at ℙ 129. But even those corrective actions are contradicted or disputed by the record. For instance, Mr. Drizos was disciplined for allegedly failing to tell O'Brien that he would not be in the morning of April 11, 2018, even though she knew that his daughter had been born on April 10, 2018, and that he would likely be with his newborn daughter the next day (as any new father would reasonably be expected to be). *See* Appx103-104 at ℙ 43 and Appx117-118 at ℙℙ 136-139.

Mr. Drizos' termination ultimately after he disclosed his intention to take another leave of absence to further address his alcoholism in early or mid-May 2017. *See* Appx118 at ℙℙ 140-141. Mr. Drizos explained to O'Brien that it would take him a few weeks to determine how he could take this leave of absence, explaining that he needed to reserve a bed at Hazeldon, determine what leave was available to him, and organize his practice before he left. *See* Appx118 at ℙ 142. When Mr. Drizos told O'Brien that he intended to take another leave of absence, she "sighed" out loud and did not engage in the conversation, and she became visibly upset and frustrated, and she never spoke with Mr. Drizos about his intention to take another leave of absence and seemed to distance herself from him after that. *See* Appx118 at ℙℙ 143-144. Soon after, O'Brien gave Mr. Drizos a final written warning on, what he

believes, were alleged violations of the *ad hoc* "call-out procedure" that she said occurred in late May and on June 1, 2018. *See* Appx119 at ⁋ 145. He was terminated on June 28, 2018, after he was said to have violated the targeted "call-out procedure" a few days earlier. *See* Appx119 at ⁋ 148.

## II.   A reasonable jury could conclude that PNC Investments retaliated against Mr. Drizos in violation of the ADA and PHRA because he requested a leave of absence to accommodate to alcoholism

"A pretext claim of illegal retaliation follows the familiar burden shifting analysis of Title VII claims set forth in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973)." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (additional citations omitted) (internal quotations omitted). "Thus, in order to prevail under a pretext theory of illegal retaliation a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.* (internal quotations and citations omitted). "If the plaintiff is able to establish these elements of his/her *prima facie* case, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Id.* (citation omitted). "If the employer satisfies that burden, the plaintiff must then prove that retaliatory animus played a role in the employer's decisionmaking [sic] process and that it had a determinative effect on the outcome of that process." *Id.*

(citation omitted). By contrast, the Third Circuit establishes that a plaintiff need only show that the unlawful motive was a "substantial motivating factor" in the adverse employment action to prevail under a mixed-motive theory. *Id.* (quoting *Watson v. Southeastern Pennsylvania Transp. Auth.*, 207 F.3d 207, 215 (3d Cir. 2000). Protected activity includes an employee's right to request an accommodation in good faith. *Id.* at 190 (holding that "[t]he right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC").

With respect to PNC Investments' retaliation when Mr. Drizos voiced his intention to take another leave of absence, the district court again relies on its assumption that the *ad hoc* "call-out procedure" was implemented legitimately and non-discriminatorily. The district court likewise again ignores all the evidence of pretext, *supra*. Mr. Drizos did far more than provide some speculative or abstract notion that he may take another leave of absence in the indefinite future. He disclosed important information that he needed help, that he had a plan as to how he was going to get that help, and that he was going to take another leave of absence as a solution.

PNC Investments knew that Mr. Drizos took leaves of absence in the past, and they knew that he intended to take another leave of absence at present. The district court's mistaken belief that his termination was an intervening event breaking the

causal link creates a rule of law whereby any employer could ignore a good faith request for an accommodation, and then turn around and terminate the employee under reasons. A reasonable jury could conclude that Mr. Drizos was terminated because he voiced his intention to take another leave of absence.

## III.    A reasonable jury could conclude that PNC failed to accommodate Mr. Drizos' disability, and that it failed to engage in the interactive process

An employer unlawfully discriminates against an employee by failing to "mak[e] accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Taylor*, 184 F.3d at 311 (quoting 42 U.S.C. § 12112(b)(5)(A)). "In evaluating whether a plaintiff is a qualified individual with a disability, we have held that a plaintiff must satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. and, the plaintiff must be able to perform the essential functions of the position held or desired, with or without reasonable accommodations." *Id.* (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(m) at 351) (additional citations omitted).

"To determine the appropriate reasonable accommodation, it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise

limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." *Id.* (quoting 29 C.F.R. § 1630.2(o)(3)). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." *Id.* (quoting 29 C.F.R. Pt. 1630, App. § 1630.0 at 359).

Requests for reasonable accommodations do not need to be in writing and may be done through "plain English," without ever mentioning the ADA or the phrase "reasonable accommodation." *Id.* at 313. The request need only "make clear that the employee wants assistance for his or her disability." *Id.* "What matters under the ADA are not formalisms about the manner of the request, but whether the employee … provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for the accommodation." *Id.* "The interactive process, as its name implies, requires the employer to take some initiative." *Id.* at 315. "This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." *Id.* at 316 (quoting 29 C.F.R. § 1630.2(o)(3)).

Since at least early or mid-May 2018, Mr. Drizos made clear to O'Brien that he needed additional treatment, and that he was trying to determine the best way to get help, which he expected to be another medical leave of absence for rehabilitation. *See* Appx118 at ¶ 140-141. Mr. Drizos explained to O'Brien that it would take him a few weeks to determine how he could take this leave of absence, reserve bed space, determine what leave was available to him, and organize his practice before he left. *See* Appx118 at ¶ 142. When he disclosed this intention, O'Brien she "sighed" out loud and did not engage in the conversation. *See* Appx118 at ¶ 143. O'Brien became noticeably upset and frustrated, and she never spoke with Mr. Drizos about his intention to take another leave of absence and seemed to distance herself from him after that. *See* Appx118 at ¶ 144. Although O'Brien did not communicate with Mr. Drizos about another leave of absence, she discussed it behind the scenes with Lockard on May 24, 2018. *See* Appx118 at ¶ 140 (establishing conversation between O'Brien and Lockard on May 24, 2018, during which Lockard was already under the impression that Mr. Drizos might be out on another leave of absence).

Mr. Drizos formally advised O'Brien that he intended to take another leave of absence for his alcoholism when he received the final written warning on June 8, 2018. *See* Appx119 at ¶ 146. He knew he could not adhere to the new *ad hoc* "call-out procedures" and other scrutiny in the workplace without it. O'Brien informed Mr. Drizos that he was terminated on June 28, 2018, but Mr. Drizos had still not

confirmed bedspace to reserve for inpatient rehabilitation. *See* Appx119 at ⁋ 149.

Lockard knew that Mr. Drizos intended to take another leave of absence but did

nothing to interact with him, *see* Appx118 at ⁋ 140, despite being familiar with the

interactive process. *See* Appx121 at ⁋ 161-162 (admitting that she is familiar with

the interactive process and that she never engaged in it with Mr. Drizos). A

reasonable jury could conclude that Mr. Drizos was a qualified individual who could

have been accommodated by PNC Investments.

## IV. The district court used the incorrect standard of proof to analyze Mr. Drizos' FMLA retaliation claims

The district court analyzed Mr. Drizos' FMLA retaliation claims using the

ADA's "determinative factor" causation standard.  See Appx8-9.   It should have

used the "negative factor" standard set forth in the FMLA's implementing

regulations. 29 C.F.R. § 825.220(c). The district court's failure to apply the correct

causation standard caused it to incorrectly conclude that Mr. Drizos cannot, as a

matter of law, establish a "causal link" between voicing his intention to take leave

and his termination.

Unlike the ADA, the FMLA does not require an employee to prove that his

protected activity was the "determinative factor" or "but-for cause" of his

termination.[7] See *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 273-74 (3d Cir.

---

[7] See *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 654 (W.D. Pa. 2018)
(citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir.

2017).  A plaintiff asserting an FMLA retaliation claim only needs to show that his request "was *a 'negative factor'* that *hastened his termination.*"  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 311 (3d Cir. 2012) (citing 29 C.F.R. § 825.220(c)) (emphasis added).  Mr. Drizos thus "does not need to prove that invoking FMLA rights was the *sole* or *most important* factor upon which [O'Brien] acted." *Id.* at 301 (emphasis added). O'Brien's decision to terminate Mr. Drizos violated the FMLA's retaliation prohibition if it was even *partially* motivated by his FMLA leave request.  *See Lichtenstein* at 311. ("[A] termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA.") (quoting *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 726 (6th Cir.2003)).

The difference between the "but-for" and "negative factor" standards goes to O'Brien's motivation for firing Mr. Drizos, which is the central issue in his FMLA retaliation claim.  See *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 275, n.5 (3d Cir. 2017). The district court's application of the incorrect standard to the FMLA retaliation claim thus constituted reversible error. *Id.*

The district court's decision to grant summary judgment on the FMLA retaliation claim rested on its conclusion that the "causal link" connecting Mr.

---

2007) (applying "determinative factor" standard to retaliation claim under the ADA.).

Drizos' leave requests to his termination was "severed" when he "violated call out procedures." Appx8. As stated *supra*, it was incorrect for the district court to resolve this key factual dispute (i.e., the reason for the termination) in favor of PNC Investments. It was also an incorrect application of the standard for FMLA retaliation claims because the district court failed to acknowledge the possibility that O'Brien was motivated by more than one factor. The FMLA specifically contemplates this possibility and imposes liability if FMLA leave was a negative factor in the termination, even if it was not the most important factor. Thus, if a jury concluded that O'Brien was motivated *both* by Mr. Drizos' FMLA leave request *and* his failure to call her when working from home, Mr. Drizos would nevertheless prevail on his FMLA claims. [8] Because he presented more than sufficient evidence for a jury to reach this conclusion, the district court should not have granted summary judgment.

To that end, the record contains evidence from which a jury could conclude that O'Brien viewed Mr. Drizos' previous use of FMLA leave negatively. His previous leaves of absence were a source of frustration and inconvenience for her. *See* e.g., Appx96-98, at ¶¶ 26-31, Appx113 at ¶ 104; Appx114 at ¶¶ 109-10. During the First Leave of Absence, O'Brien did not adequately cover his workload and

---

[8] The FMLA does not treat causation as a single "chain" that can be broken by one intervening event, but rather as a "rope" consisting of multiple "strands" of motivating factors.

allowed 70 or more of his accounts to become seriously delinquent. Appx112-113 at 94-100. Following this leave of absence, O'Brien informed HR that the potential that Mr. Drizos would take another leave of absence was a "threat to [her] team's performance." Appx114 at ¶109. She attempted to reassign his managed accounts to another employee because she feared that he would "go out again," even though she knew that this would negatively impact his compensation. *Id.* at ¶110.

Moreover, she engaged in a pattern of harassing conduct following the First Leave of Absence by implementing constant monitoring, increased and unjustifiable scrutiny of his work, unjustified disciplinary actions, a plan to transfer his accounts to another advisor if he used his FMLA leave again, and the above-reference attempt to divest him of his managed accounts simply out of fear he would take another leave. *See* Appx112 at ¶¶ 91-93; Appx114 at ¶106-110; Appx115-117 at ¶¶ 114-135. These actions began even while Mr. Drizos was on leave and continued until he was terminated. *Id.* A jury could reasonably conclude from this historical animus that O'Brien viewed Mr. Drizos' prior use of FMLA leave, and his potential future use of leave, negatively.

A reasonable jury could also conclude that the "call-out procedures" that formed the basis for Mr. Drizos' termination were themselves part of O'Brien's retaliatory course of conduct. It is undisputed that Mr. Drizos was the only financial advisor who O'Brien required to report his whereabouts and notify her any time he

would not be physically present at his branch, which she implemented when he returned from leave so that he would "stay on track."  Appx103 at ¶42; Appx115 at ¶¶ 114-119; Appx 117 at ¶128-9.  If the rule he was terminated for breaking (calling out his whereabouts to O'Brien) was imposed in retaliation for his taking FMLA leave, then his use of FMLA leave was, *per se*, a negative factor in his termination.

The record also demonstrates obvious temporal proximity between Mr. Drizos' request for another leave of absence and his termination. Temporal proximity alone can be sufficient for Mr. Drizos to defeat summary judgment as to his FMLA retaliation claims. *See Lichtenstein* at 307 ("When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this "is sufficient standing alone to create an inference of causality and defeat summary judgment.").  Less than two months elapsed between Mr. Drizos' first suggestion to O'Brien that he intended to take a future leave of absence and his termination. Appx118-119 at ¶¶ 140-45. And less than three weeks elapsed between his formal notice of FMLA leave and her decision to terminate him.  Appx119 at ¶¶145-149.

The district court acknowledged this temporal proximity but dismissed it while finding that the only reason for his termination was his failure to follow the *ad hoc* "call-out procedures." Appx at 8-9. Here, the district court again applied the incorrect standard and failed to acknowledge the possibility that O'Brien may have

had multiple motivations. The temporal proximity, when viewed in conjunction with the other evidence of retaliatory animus, is sufficient for a reasonable jury to conclude that Mr. Drizos' request for additional leave was a *negative factor* in O'Brien's decision to terminate him.

## V.    The district court did not address Mr. Drizos' claim that PNC Investments failed to reinstate him to an equivalent position when he returned from the First Leave of Absence

The district court granted summary judgment on Mr. Drizos' FMLA interference claims because it concluded that "Plaintiff is not able to show that FMLA benefits were actually withheld." To the contrary, Mr. Drizos did not receive his full FMLA benefit because PNC Investments allowed his work to accumulate while he was on leave and then required him to complete it immediately upon his return. This significantly increased his workload and altered his job duties. Thus, the position to which he returned was not "equivalent" to the position he left.

The FMLA provides that when an employee returns from approved leave, the employer must reinstate the employee to an "equivalent position." 29 U.S.C.A. § 2614(a)(1). "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. 29 C.F.R. § 825.215 (a) "An equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position." *Id.* at 825.215(e). "The

employee is ordinarily entitled to return to . . . the same or an equivalent work schedule." Id. The regulations provide an exception for "de minimis, intangible, or unmeasurable aspects of the job." See 29 C.F.R. § 825.215(f).

Mr. Drizos did not return to a position with "virtually identical" duties, working conditions, effort or work schedule. While Mr. Drizos was on leave O'Brien allowed more than 70 of his accounts to become delinquent. Appx111 at ¶¶ 86-89; Appx112-113 at ¶¶ 94-103 When he returned, O'Brien told him he needed to immediately review these accounts to bring them current. Id. Each review took a minimum of one and a half hours, with some complex reviews taking longer. *See* Appx96 at ¶26. Thus, Mr. Drizos returned to a backlog of over 100 hours of work, which he needed to perform "immediately" in addition to his regular responsibilities.

In its Reply, PNC Investments did not dispute that Mr. Drizos' workload increased or provide evidence that this increase was "de minimis, intangible or unmeasurable." Appx814. It only argued that the changes to Mr. Drizos' job were "not substantial." Id. This is not the standard for an "equivalent position" under the law. *See supra*. Moreover, "Determining whether the job offered is equivalent is generally a question of fact for the jury." *Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 489 (D.N.J. 2002) (citing *Watkins v. J & S Oil Co.*, 164 F.3d 55, 59–60 (1st Cir.1998)). *See also Stokes v. City of Montgomery,* No. 2:07CV686-WHA, 2008 WL 4369247, at *15 (M.D. Ala. Sept. 25, 2008) ("Equivalency of position

ordinarily is an inquiry that is fact-intensive, and would not seem to lend itself to a determination as a matter of law."). The district court entirely failed to address Mr. Drizos' "equivalent position" argument. Because whether a job is "equivalent" is a question of fact for the jury and a reasonable jury could conclude that his job duties were not "equivalent" upon his return from leave, this Court should reverse the district court's entry of summary judgment as to Mr. Drizos' FMLA interference claims.

## <u>CONCLUSION</u>

Based on the foregoing, Mr. Drizos respectfully requests that this Honorable Court reverse the district court's grant of summary judgment and remand this case for trial.

<u>/s/Alec B. Wright, Esquire</u>
Pa. ID No. 316657

Margaret S. Coleman, Esquire
Pa. ID No. 200975

O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32A

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,787 words excluding the parts of the brief exempted by Fed. R. App. P.32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2209) in font size 14, font style Times New Roman.

## CERTIFICATION OF BAR MEMBERSHIP

We certify that we are members in good standing of the bar of the U.S-. Court of Appeals for the Third Circuit.

## CERTIFICATION OF TEXT OF E-BRIEF

We certify that the text of the E-Brief and the text of the hard copies of appellant's brief are identical.

## CERTIFICATION OF VIRUS CHECK

We certify that a virus check was performed on the .PDF file of appellant's brief. The virus software used was McAfee LiveSafe Virus Scan.

Dated:  November 3, 2022        /s/Alec B. Wright, Esquire
                                Pa. ID No. 316657

                                /s/Margaret S. Coleman, Esquire
                                Pa. ID No. 200975

                                O'BRIEN COLEMAN & WRIGHT LLC
                                116 Boulevard of the Allies
                                Pittsburgh, PA  15222
                                (412) 232-4400

                                Attorneys for Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing **Appellant's Brief and Appendix** with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by the using the appellate CM/ECF System. Participants in the case are registered CM/ECF users and service will also be accomplished by the appellate CM/ECF system on November 3, 2022.

Esteban Shardonofsky, Esquire
Seyfarth Shaw, LLP
700 Milam Street, Suite 1400
Houston, TX  77002

Brandon L. Dixon, Esquire
Seyfarth Shaw, LLP
233 Wacker Drive, Suite 8000
Chicago, IL  60606

Dated November 3, 2022

/s/Alec B. Wright, Esquire
Pa. ID No. 316657

Margaret S. Coleman, Esquire
Pa. ID No. 200975

O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorneys for Appellant