No. 22-1736

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

**STEPHEN DRIZOS**,

*Plaintiff-Appellant,*

---v.---

**PNC INVESTMENTS LLC d/b/a PNC INVESTMENTS**,

*Defendant-Appellee.*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA
CASE NO. 2:19-CV-01651**

---

BRIEF FOR DEFENDANT-APPELLEE

---

Esteban Shardonofsky
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, TX 77002
Phone: (713) 225-2300
Fax: (713) 225-2340
*Counsel for Defendant-Appellee*

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST

Pursuant to Fed. R. App. P. 26.1 and L.A.R. 26.1.1, Defendant-Appellee PNC Attorneys for Defendant-Appellee, PNC Investments LLC states that it is a limited liability company whose sole member is PNC Bank, N.A; PNC Bank, N.A. is a wholly-owned subsidiary of PNC Bancorp, Inc.; PNC Bancorp, Inc. is a wholly-owned subsidiary of The PNC Financial Services Group, Inc., whose stock is traded on the New York Stock Exchange; and no one person or entity owns more than 10% of the stock of PNC Investments LLC. No publicly owned corporation, not a party to the case, has a financial interest in the outcome.

90330546v.2

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF
FINANCIAL INTEREST ........................................................................ II

STATEMENT REGARDING ORAL ARGUMENT ............................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE / FACTUAL BACKGROUND ............. 5

SUMMARY OF ARGUMENT ............................................................ 14

ARGUMENT ...................................................................................... 17

I.      Standard of Review ................................................................. 17

II.     Appellant's Disability Discrimination Claims Fail As A Matter of
        Law .......................................................................................... 17

        A.      Appellant Was Not Otherwise Qualified For The Financial
                Advisor Position ........................................................... 18

        B.      Appellant Cannot Show Pretext ................................... 23

                1.      Appellant's Violation Of His Final Warning Was The
                        Sole Reason For His Termination .................... 24

                2.      Appellant's Allegations Of Pretext Are Belied By The
                        Record ............................................................... 25

                        a.      Appellant admits he never had a "warm"
                                relationship with O'Brien ................. 26

                        b.      Any alleged increased scrutiny of Appellant
                                following was based solely upon Appellant's own
                                behavior. ........................................... 26

                        c.      Appellant's argument that he was previously
                                allowed to work from home and was able to do his
                                job without calling-in does not establish pretext ........... 30

iii

d.  PNC's handling of Appellant's managed account reviews was done pursuant to PNC's policies and is not pretext for discrimination. ....................................31

e.  O'Brien did not "scheme" to take Appellant's accounts. ........................................35

f.  Appellant's perception of alleged "harassment" by Rhome-Smith and O'Brien does not establish pretext. ........................................36

g.  Appellant's alleged notification that he "may" take leave at some point in the future does not establish pretext. ........................................37

3.  There is Overwhelming Evidence Disproving Any Discriminatory or Retaliatory Animus .....................................39

III.  Appellant's Failure to Accommodate Claims Also Fail As A Matter Of Law ....................................................................40

IV.  Appellant Cannot Establish a *Prima Facie* Case of Retaliation Under Any Statute. ...................................................42

V.  Appellant Cannot Establish Pretext With Respect to His ADA, PHRA, and FMLA Retaliation Claims, or that His FMLA Leave was a "Negative Factor" in the Termination Decision ...........................................45

VI.  Appellant's FMLA Interference Claim Fails As A Matter Of Law .............46

VII.  Conclusion ...............................................................48

90330546v.2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albright v. Trustees of Univ. of PA*,
   No. 19-00049, 2019 WL 5290541 (E.D. PA Oct. 18, 2019)..............................20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................17

*Anderson v. Nations Lending Corporation*,
   27 F.4th 1300 (7th Cir. 2022) .........................................................48

*Beverly Gagne, v. SAFE Fed. Credit Union*,
   No. CV 3:18-208-JMC-PJG, 2020 WL 2476651 (D.S.C. Jan. 30,
   2020) ......................................................................................41

*Brown v. Chase Brass & Copper Co.*,
   14 F. App'x 482 (6th Cir. 2001) .........................................................41

*Capps v. Mondelez Glob., LLC*,
   847 F.3d 144 (3d Cir. 2017) .......................................................40, 42

*Carpenter v. York Area United Fire & Rescue*,
   No. 1:18-CV-2155, 2020 U.S. Dist. LEXIS 67650 (M.D. Pa. April
   17, 2020) ................................................................................45

*Drwal v. Borough of West View, Pa.*,
   617 F. Supp. 2d 397 (W.D. Pa. 2009).............................................43, 44

*Fuentes v. Perskie*,
   32 F.3d 759 (3d Cir. 1994) .............................................................24

*George v. Genuine Parts Co.*,
   No. 3:04-108, 2007 WL 217684 (W.D. Pa. Jan. 25, 2007)................................44

*Holmes v. Cemcolift Inc.*,
   No. CIV.A.05 421, 2006 WL 2927642 (E.D. Pa. Oct. 11, 2006) ......................21

*Johnson v. Children's Hosp. of Phila.*,
   No. 94-5698, 1995 WL 338497 (E.D. Pa. June 5, 1995) ...................................19

*Johnson v. Cmty. Coll. of Allegheny Cnty.*,
566 F.Supp.2d 405 (W.D. Pa. 2008)...................................................46

*Kaiser v. Zurich N. Am.*,
No. 12-CV-6763(VSB), 2015 WL 13360299 (S.D.N.Y. Mar. 31,
2015) ....................................................................................................28

*Kollstedt v. Princeton City School Board of Education*,
No. 1:08-CV-00822, 2011 U.S. Dist. LEXIS 7404............................48

*Magel v. Fed. Reserve Bank of Philadelphia*,
776 F. Supp. 200 (E.D. Pa. 1991), aff'd 5 F.3d 1490 (3d. Cir.
1993) ....................................................................................................18

*Mandichak v. Consolidated Rail Corp.*,
No. 94-1071, 1998 U.S. Dist. LEXIS 23005 (W.D. Pa. August 20,
1998) ....................................................................................................18

*Martinelli v. Penn Millers Ins. Co.*,
269 F. App'x. 226 (3d Cir. 2008) .......................................................37

*McDonald Com. of Pa., Dept. of Public Welfare, Polk Center*,
62 F.3d 92, 96 (3d Cir. 1995) .............................................................18

*McLean v. Abington Mem'l Hosp.*,
No. CV 15-671, 2015 WL 5439061 (E.D. Pa. Sept. 15, 2015) .........41

*Miller v. Univ. of Pittsburgh Med. Ctr.*,
350 F. App'x 727 (3d Cir. 2009) ........................................................19

*Moyer v. Patenaude & Felix, A.P.C.*,
991 F.3d 466 (3d Cir. 2021) ...............................................................17

*Opsatnik v. Norfolk Southern Corp.*,
335 Fed. Appx. 220 (3d Cir. 2009).....................................................27

*RHJ Med. Ctr. v. City of DuBois*,
754 F.Supp.2d 723 (W.D. Pa. 2010.)...................................................38

*Ross v. Gilhuly*,
755 F.3d 185 (3d Cir. 2014) ...............................................................42

vi

*Soileau v. Guilford of Maine, Inc.*,
  105 F.3d 12 (1st Cir. 1997)..................................................................44

*Sulima v. Tobyhanna Army Depot*,
  602 F.3d 177 (3d Cir. 2010) .........................................................17, 18

*Williams v. Graphic Packaging Int'l, Inc.*,
  No. 1:16-CV-00102, 2018 WL 2118311 (M.D. Tenn. May 8,
  2018) .....................................................................................................44

*Wilson v. Providence Health & Servs.*,
  No. 3:14-cv-01091-JE, 2015 U.S. Dist. LEXIS 92317 (D. Or. July
  14, 2015) ...............................................................................................46

## Statutes

43 Pa.C.S. § 954 ..........................................................................................18

29 U.S.C. § 794 ...........................................................................................18

42 U.S.C. § 12101 *et seq.*..........................................................................14

42 U.S.C. § 12112(a) ............................................................................17, 18

42 U.S.C. § 12114(c)(4)..............................................................................38

Americans With Disabilities Act ...........................................................*passim*

Family and Medical Leave Act, 29 U.S.C. § 2611 *et seq*..............................*passim*

Pennsylvania Human Relations Act, 43 P.S. § 951-963..................................*passim*

## Other Authorities

29 C.F.R. § 825.220(c).................................................................................45

## STATEMENT REGARDING ORAL ARGUMENT

Appellee respectfully submits that oral argument is not necessary in this case because the facts and legal arguments are adequately presented in the briefs and record, and the application of law to the facts follows well-established precedent; thus oral argument is unnecessary to aid the Court's decisional process.

## <u>STATEMENT OF THE ISSUES</u>

The following are issues presented for review:

(1)     Whether the District Court properly granted summary judgment to
Appellee PNC on Drizo's claim of disability discrimination under the ADA and
PHRA where Drizos failed to establish a *prima facie* case or alternatively to present
any evidence establishing a genuine issue of material fact that PNC's reason for the
termination of his employment was a pretext for discrimination, especially where he
admits to the underlying facts that resulted in his final written warning and
termination of employment, and where there is overwhelming evidence disproving
any discriminatory motive;

(2)     Whether the District Court properly granted summary judgment to
Appellee PNC on Drizo's failure to accommodate claim where he never actually
requested an accommodation prior to his termination of employment (he simply
stated that he "may" take a leave or that he planned an unspecified future leave),
there is no evidence that PNC failed to make an effort to assist him, and where Drizos
admits he did not request to start any leave before his final warning or before the
date of his termination and therefore any argument he may assert alleging that he
could have been accommodated would be speculative at best or made moot by the
legitimate termination decision.

(3)     Whether the District Court properly granted summary judgment to

Appellee PNC on Drizo's claim of retaliation under the ADA, PHRA, and FMLA where Drizos failed to establish a *prima facie* case of retaliation, since (a) he failed to engage in protected activity (he did not request additional leave before his termination); and (b) his admitted violation of his final written warning was an intervening event that broke any connection between his alleged protected activity and his termination.

(4)    Whether the District Court properly granted summary judgment to Appellee PNC on Drizos' claim of retaliation under the ADA, PHRA, and FMLA where Drizos failed to present any evidence establishing a genuine issue of material fact that PNC's reason for the termination of his employment was a pretext for retaliation or that his alleged request for FMLA was a "negative factor" in the decision, especially where he admits to the underlying facts that resulted in his final written warning and termination of employment, and where there is overwhelming evidence disproving any retaliatory motive;

(5)    Whether a reasonable jury could conclude that Drizos was not returned to an "equivalent" position under the FMLA, where it is undisputed that, after his second FMLA leave, (a) PNC returned him to the same role, the same duties, same book of business, and same earnings and benefits as before he took leave, (b) PNC did not permit his work to accumulate unaddressed, but instead had several co-workers and his manager cover his account reviews to keep his hundreds of accounts

up to date; (c) he was asked to catch up on the remaining reviews when he returned from leave, but given numerous extensions to do so; and (d) he did not request help in completing his reviews once he returned.

90330546v.2

## STATEMENT OF THE CASE / FACTUAL BACKGROUND

PNC hired Appellant in 2008. Appx903, O'Brien Dec. at ¶3. In 2015, Appellant became a Financial Advisor. Appx903, O'Brien Dec. at ¶3. Appellant was a FINRA-licensed advisor who worked out of one or more of PNC Bank's branches to sell and advise on PNC's investment and insurance-related products. Appx903, O'Brien Dec. at ¶3; *see also* Appx291, Pl. Dep. at 55:8-10. One of those branches was PNC Bank's Lebanon Shops Branch ("Branch"), where the Branch Manager was Amy Rhome-Smith. Appx291, Pl. Dep. at 55:17-19; *see also* Appx310, Pl. Dep. at 74:11-15. As a Financial Advisor, Appellant worked closely with Rhome-Smith and other employees at the Branch. Appx903, O'Brien Dec. at ¶4; *see also* Appx818-819, Defendant's Reply to Plaintiff's Response to Defendant's Concise Statement of Material Facts ("SOF") at ¶6. An important part of Appellant's role was to develop and maintain strong and trusted relationships with the Branch Manager and Branch staff, so he could inform and update them about the products and services he could offer PNC customers. Appx903, O'Brien Dec. at ¶5; Appx820-821, SOF ¶7. Armed with this information, the Branch Manager and Branch staff could better and more often refer customers, who requested or would benefit from investment-related products and services, to Appellant. Appx903, O'Brien Dec. at ¶5; Appx821-822, SOF ¶8. As part of this symbiotic relationship, Rhome-Smith and the Branch employees needed to be aware of when Appellant was or was not in the Branch

because they would often walk customers over to speak with him. Appx904, O'Brien Dec. at ¶6; Appx145-146, Rhome-Smith Dep. 20:12-21:24; Appx822-823, SOF ¶ 9. They also had access to his calendar so they could set appointments for him with new or existing customers. Appx299-300, Pl. Dep. 63:24-64:2-17; Appx904, O'Brien Dec. at ¶6; Appx823-824, SOF ¶10.

In January 2017, Appellant told his supervisor, Wendy O'Brien, that he was an alcoholic. Appx504, O'Brien Dep. 31:18-25; Appx825-826, SOF ¶13. In response, according to Appellant, O'Brien was "supportive" and told him to call Human Resources regarding his need for leave. Appx336, Pl. Dep. 100:10-19. Soon thereafter, Appellant applied and was approved for an intermittent leave of absence to treat his alcoholism. Appx339, Pl. Dep. 103:2-4; Appx828-829, SOF ¶17. The leave lasted from February 11, 2017 through March 9, 2017. Appx334-335, Pl. Dep. 98:24-99:7; Appx828-829, SOF ¶17. Appellant returned to work to his Financial Advisor position with the same pay and benefits. Appx586, 604-605, O'Brien Dep. 113:18-23, 131:25-132:3; Appx829-830, SOF ¶18.

Prior to his first leave of absence, Appellant, like all Financial Advisors reporting to O'Brien, was required to notify her if he was going to be taking the day off. Appx509-510, O'Brien Dep. 36:24-25; 37:1-3; Appx827, SOF ¶15. Also prior to his first leave of absence, O'Brien required Appellant, like all Financial Advisors reporting to her, to notify her and the Branch if he would be late to work, leaving

early, or had a medical appointment. Appx510, O'Brien Dep. 37:4-13; Appx828, SOF ¶16. O'Brien made clear to Appellant that she expected him to let the Branch manager know where he was going to be throughout the day. Appx304, Pl. Dep. 69:3-8; Appx828, SOF ¶16.

Prior to his leave, Appellant began to have some absences and tardies that O'Brien felt were becoming a problem. Appx509, O'Brien Dep. 36:12-16; Appx826-827, SOF ¶14. O'Brien, however, did not discipline Appellant for his absences and tardies because Appellant told her he needed to attend rehab and then did so. Appx509, O'Brien Dep. 36:17-23; Appx826-827, SOF ¶14. Following his return from leave, Rhome-Smith reported to O'Brien in May 217 that Appellant missed several preplanned, weekly Savings, Investments and Retirement meetings (SIRS) with her in the mornings, including meetings on May 1, May 15, and May 25. Appx904, O'Brien Dec. ¶10; Appx169-170, Rhome-Smith Dep. 44:25-45:3; Appx830-831, SOF ¶19. O'Brien counseled Appellant and gave him a verbal warning that his attendance must improve and that he needed to maintain his regular in-person hours at the Branch. Appx904, O'Brien Dec. ¶10; Appx831, SOF ¶20. Appellant does not dispute missing those meetings, claiming only at his deposition that he does not recall missing them and that he was working from home during the mornings. Appx339-340, Pl. Dep. 103:16-24, 104:2-7; Appx831, SOF ¶21. However, Financial Advisors are prohibited from working from home because they

are an integral part of PNC's business model of providing a full-service customer experience at the branches where they work, and it is important for them to be available to co-workers and walk-in customers throughout the day, and not just when they have pre-scheduled appointments. Appx604, O'Brien Dep. 131:16-24; Appx904, O'Brien Dec. ¶7; Appx824, SOF ¶11. The personal connection is an essential part of building the trust necessary for customers to feel comfortable enrolling in PNC investment-related products and services, which is why PNC requires Financial Advisors to maintain regular in-person hours at their assigned branches. Appx904, O'Brien Dec. ¶8; Appx825, SOF ¶12.

In late May 2017, Appellant again requested and was approved for leave based upon his alcoholism. Appx342, Pl. Dep. 106:4-18; Appx832, SOF ¶22. Specifically, PNC granted Appellant concurrent FMLA and short term disability leave.  Appx341-343, Pl. Dep. 105:21-107:6; Appx787, FMLA Exhaustion Letter; Appx779-784, STD Approval Letters; Appx832, 867, SOF ¶¶22, 85. The leave began on May 30, 2017 and was initially expected to last thirty days. Appx341-343, Pl. Dep. 105:21-107:6; Appx832, SOF ¶23. After several extensions approved by PNC, Appellant returned to work on August 30, 2017, for a total of 13 weeks of leave. Appx60, Lockard Dec. ¶5; Appx341-343, Pl. Dep. 105:21-107:6; Appx832, SOF ¶23. Appellant returned to work to his same position with the same pay and benefits. Appx604-650, O'Brien Dep. 131:25-132:1-3; Appx832-833, SOF ¶24.

PNC and each Financial Advisor have a fiduciary responsibility for managed investment accounts and are required by financial regulations to conduct a yearly review of managed accounts with the client account holder. Appx332-333, Pl. Dep. 96:10-16; 97:22-24; Appx833, SOF ¶25. Appellant had approximately 350 clients in 2017.  Appx332-333, Pl. Dep. 96:17-19. Reviews took approximately an hour and half. Appx333, Pl. Dep. 97:8-14; Appx833-834, SOF ¶26. While Appellant was on FMLA leave, PNC could not transfer Appellant's accounts to another Financial Advisor during his leave because to do so would cut off Appellant's trailing revenues from those accounts and deny Appellant his main source of compensation while he was on leave. Appx543, O'Brien Dep. 70:6-21; Appx834-835, SOF ¶27. During Appellant's second FMLA leave, PNC requested that other Financial Advisors cover Appellant's account reviews without additional compensation in order to assist in trying to keep Appellant's hundreds of accounts up to date. Appx543, O'Brien Dep. 70:6-21; Appx835-836, SOF ¶28. Up to three Financial Advisors assisted in the review process at any given time during Appellant's leave. Appx543-544, O'Brien Dep. 70:22-71:1; Appx836-837, SOF ¶29. O'Brien herself assisted by entering all of the account review notes from each account meeting into PNC's system. Appx544,  O'Brien Dep. 71:20-72:1; Appx837-838, SOF ¶30. O'Brien testified that she and her team conducted as many reviews as they could during Appellant's absence. Appx545, O'Brien Dep. 72:7-9; Appx838-839, ¶31. Upon his return from

his FMLA leave, O'Brien granted Appellant extensions to complete his reviews, and Appellant admitted that he did not request help in completing his reviews once he returned. Appx359, 361-362, Pl. Dep. 123:3-9, 125:10-15, 126:2-18; Appx839, SOF ¶32.

Appellant's attendance problems continued following this second leave of absence. Appellant was absent from work on October 24 and October 25, 2017. Appellant did not call or otherwise reach out to O'Brien (or have anyone else do so on his behalf) to inform her of his absence. Appx519-521, O'Brien Dep. 46:11-48:4; 128:18-129:3; Appx843-844, 845, SOF ¶¶38, 40. Instead, O'Brien had to call his ex-wife on the second day to find out where he was. Appx282-284, Pl. Dep. at 46:11-48:4; Appx845, SOF ¶40. O'Brien later learned that Appellant had been in a car accident where he had run his car off the road and sheared a utility pole, knocking out power to the entire surrounding area. Appx519-521, O'Brien Dep. 46:11-48:4; 128:18-129:3; Appx904, O'Brien Dec. ¶11; Appx843-844, 845, SOF ¶¶38, 40. When Appellant returned to work, O'Brien reminded him that he had to notify her when he was not going to be in the office. Appx471, Pl. Dec. ¶45.

In January 2018, the PNC Investments Compliance department learned that five months earlier, in August 2017 during Appellant's second leave of absence, he had been charged with disorderly conduct. Appx905, O'Brien Dec. ¶17; Appx839-840, SOF ¶33. PNC learned that the disorderly conduct charge stemmed from an

incident where, at 4:30 a.m., Appellant called police to tell them his car stopped working. According to news articles published about the incident, when the police arrived, they found him in the middle of the street screaming at passing cars, flailing his arms, and dancing like a ballerina while blocking traffic. Appx905, O'Brien Dec. ¶18; Appx850-841, SOF ¶34. News outlets reported that Appellant admitted at the scene that he had been using cocaine. Appx905, O'Brien Dec. ¶19; Appx841, SOF ¶35. Appellant does not deny that he admitted to using cocaine that evening or that he had, in fact, used cocaine. Appx350, Pl. Dep. 114:6-13; see also Appx453, Pl. Dep. 217:4-6. As a FINRA registered advisor, Appellant had an obligation to report to PNC Investments such criminal charges within 30 days. Appx906, O'Brien Dec. ¶20; Appx841-843, SOF ¶36. Appellant was fully aware of this requirement. PNC Investments, as his sponsoring broker-dealer, could be responsible for significant fines for not reporting such an event in a timely fashion to FINRA. Appx906, O'Brien Dec. ¶20; Appx841-843, SOF ¶36. By the time that PNC was made aware of the incident, the event had occurred approximately five *months* before, well in excess of the 30-day reporting requirement. Appx906, O'Brien Dec. ¶21; Appx843, SOF ¶37. Accordingly, O'Brien gave Appellant a final written warning for failure to timely report his arrest and charge as required. Appx908-909, Final Warning.

In mid-February 2018, Appellant was over 30 minutes late to a quarterly sales meeting and was again counseled by O'Brien regarding his attendance, tardiness and

failure to follow call-out procedures. Appx905, O'Brien Dec. ¶12; Appx846-848, SOF ¶41. Appellant does not deny that he missed the meeting; he simply states that he cannot remember doing so. Appx371-375, Pl. Dep. at 135:16-139:20; Appx846-848, SOF ¶41. Despite this continued counseling, on April 11, 2018, Appellant failed to follow proper call-out procedures when he did not call O'Brien to inform her that he would not be in that morning. Appx905, O'Brien Dec. ¶13; Appx849, SOF ¶43.

Appellant then took vacation on May 17 and May 18, 2018, without informing Rhome-Smith that he would be out of the Branch, causing Appellant to miss several pre-set client appointments. Appx905, O'Brien Dec. ¶14; Appx850-851, SOF ¶44. Appellant does not recall if he took vacation days on May 17 and 18, 2018, without notice, or if he missed prescheduled appointments. Appx389, Pl. Dep. 153:5-21; Appx851-852, SOF ¶45. On May 24, Appellant again did not follow call-out procedures when he failed to inform O'Brien that he would not be in the Branch until the afternoon. Appx904, O'Brien Dec. ¶14; Appx852-853, SOF ¶46. And, yet again, O'Brien counseled Appellant. Appx905, O'Brien Dec. ¶14; Appx852-853, SOF ¶46. On May 31 and June 1, 2018, Appellant was absent from work and failed to let O'Brien know before he was absent.  Appx391-393, Pl. Dep. 155:13-156:6-13, 157:15-18; Appx853-854, SOF ¶47. As a result, O'Brien placed Appellant on another final written warning on June 7, 2018. Appx853-854, Pl. Dep. 155:13-156:6-

13, 157:15-18; Appx855, SOF ¶48. Appellant testified he did not and does not dispute this final warning. Appx393, Pl. Dep. 157:8-18; Appx855-856, SOF ¶50.

Despite repeated counseling and a final written warning for attendance, on June 25, 2018, Appellant did not report for work, and he did not call or contact O'Brien prior to his absence. Appx406, Pl. Dep. 170:14-23; Appx856-857, SOF ¶51. Appellant, however, admits that he understood the clear expectation that he was required to call before the start of the workday if he was not going to be in the branch on a particular day. Appx393, Pl. Dep. 157:8-18, 171:15-18; Appx855, SOF ¶49. Appellant also admits that his failure to report to the Branch on June 25, 2018 without calling O'Brien was a violation of his final written warning. Appx407, Pl. Dep. 171:8-18; Appx857-858, SOF ¶52.

On June 26, O'Brien called Employee Relations to inform them that Appellant violated the terms of his final written warning and, after consultation with the Employee Relations Representative, made the decision to terminate Appellant's employment. Appx905, O'Brien Dec. ¶16; Appx858, SOF ¶53. The next day, June 27, O'Brien met with Appellant to discuss his violation of the final written warning and to inform him that PNC was terminating his employment. Appx472, Pl. Affd. ¶ 61; Appx408, Pl. Dep 172:8-10. On July 2, 2018, almost one week later, Appellant called PNC's third party administrator to request an FMLA and short-term disability leave of absence. Appx803. The third party administrator denied Appellant's request

because he was no longer employed. Appx473, Pl. Affd. ¶ 63. In 2018, Appellant did not apply for FMLA or any other type of leave until after PNC terminated his employment. Appx405, Pl. Dep. 169:10-12; Appx858-859, SOF ¶54.

## SUMMARY OF ARGUMENT

Appellant Stephen Drizos, a former PNC employee filed this lawsuit claiming that PNC discriminated and retaliated against him, and failed to accommodate his alleged disability, in violation of the Americans With Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA")[1] and the Pennsylvania Human Relations Act, 43 P.S. § 951-963 ("PHRA"), after the PNC terminated his employment following his admitted violation (yet another unexcused absence) of a final written warning related to his excessive and unexcused absenteeism. Appellant also alleges that PNC interfered with his rights under and retaliated against him in violation of the Family and Medical Leave Act, 29 U.S.C. § 2611 *et seq.* ("FMLA"), because PNC allegedly did not return his to an "equivalent" position after his second and because PNC terminated his employment.

As demonstrated below, Appellant's claims (jointly and separately) fail as a matter of law. The undisputed facts demonstrate that PNC did not discriminate or

---

[1] Appellant also pursued alternative theories under the ADA premised upon having a record of disability and/or being regarded as disabled. For the same reasons his primary claims fail as a matter of law, so to do Appellant's alternative claims.

retaliate against Appellant based upon his alleged disability or his record of alleged disability, nor did the PNC regard him as disabled. Rather, the evidence demonstrates that PNC went out of its way to accommodate Appellant on multiple occasions and, indeed, PNC granted each accommodation request that he made. To that end, PNC permitted Appellant to take two separate leaves of absence for his substance abuse in 2017, for a total of almost 19 weeks of leave. Then, after each leave, PNC returned Appellant to his position as a Financial Advisor with no material changes to his role, and with the same compensation and benefits structure.

Moreover, PNC did not terminate Appellant's employment when he violated the Financial Industry Regulatory Authority's ("FINRA") regulations by failing to report an arrest for his admitted cocaine use or after he was charged with driving under the influence ("DUI") when he crashed into a utility pole, knocking out power to the surrounding area. PNC also did not terminate or discipline Appellant for receiving a second DUI in April 2018.

Instead, in response to Appellant's multiple and continued unapproved absences, for which he failed to notify his manager, Wendy O'Brien, PNC provided Appellant with numerous opportunities to improve his attendance. For example, O'Brien verbally counseled Appellant many times about his attendance and tardiness before advancing to formal warnings under PNC's progressive disciplinary policy. Appellant's absenteeism did not improve, however, resulting in additional verbal

90330546v.2

and then written warnings. On June 7, 2018, PNC eventually placed Appellant on a final written warning for failing to show up to work on two consecutive days without notifying O'Brien in accordance with PNC's call-out procedures. Two weeks later, on June 25, 2018, Appellant admittedly violated his final written warning when he failed to report to work yet again and failed to notify O'Brien that he was not coming in to work at the branch. For this reason alone, PNC terminated Appellant's employment. One week <u>after</u> his termination, Appellant requested FMLA leave, which was denied. Accordingly, Appellant cannot establish a disability discrimination, retaliation, or failure to accommodate claim under the ADA or PHRA under any theory of recovery.  Nor can he show that PNC interfered with his rights or retaliated against him under the FMLA.

For these reasons, as further outlined below, the District Court's opinion should be affirmed.

# **ARGUMENT**

## I.    **Standard of Review**

This Court reviews "the District Court's grant of summary judgment de novo and appl[ies] the same standard employed by the District Court." *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (citations omitted). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Id*. (quoting Fed. R. Civ. P. 56(a)). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a dispute of material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## II.    **Appellant's Disability Discrimination Claims Fail As A Matter of Law**

"The ADA prohibits covered employers from discriminating against disabled individuals" on the basis of their actual or suspected disability.  *Sulima v. Tobyhanna Army Depot,* 602 F.3d 177, 185 (3d Cir. 2010) (citing 42 U.S.C. § 12112(a)); *see also* 42 U.S.C. § 12112(a) (stating that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability."). "To establish a *prima facie* case of discrimination" in violation of the ADA, "a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to

an adverse employment decision as a result of discrimination."[2] *Sulima,* 602 F.3d at

185 (citing *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999)); *see*

*also* 42 U.S.C. § 12112(a); 29 U.S.C. § 794; 43 Pa.C.S. § 954.

### A.    Appellant Was Not Otherwise Qualified For The Financial Advisor Position

Under the ADA and/or the PHRA, a plaintiff is not "qualified" unless he can

perform the essential functions of the job with or without reasonable

accommodations.  *Mandichak,* 1998 U.S. Dist. LEXIS at *14; *McDonald Com. of*

*Pa., Dept. of Public Welfare, Polk Center,* 62 F.3d 92, 96 (3d Cir. 1995). Here,

Appellant was not qualified for the Financial Advisor position because he did not

have regular attendance and could not follow PNC's attendance and call-out

procedures for when he was absent from the Branch.[3]

---

[2] A disability discrimination claim brought under the PHRA is, likewise, analyzed in the exact same manner as one brought under the ADA. *Mandichak v. Consolidated Rail Corp.*, No. 94-1071, 1998 U.S. Dist. LEXIS 23005 at *9 (W.D. Pa. August 20, 1998); *Magel v. Fed. Reserve Bank of Philadelphia*, 776 F. Supp. 200, 201 (E.D. Pa. 1991), aff'd 5 F.3d 1490 (3d. Cir. 1993). Thus, PNC will refer to Appellant's ADA and PHRA claims collectively under the standards set forth for analyzing an ADA claim, and references to the ADA shall incorporate both the ADA and the PHRA. As explained herein, Appellant's disability discrimination claims fail under both of these statutes.

[3] While Appellant's Complaint includes claims based on his alleged bipolar disorder, he did not raise these issues during the parties' summary-judgment briefing and, on appeal, makes no argument regarding his bipolar disorder. PNC does not address these claims, as Appellant has abandoned/waived them.

"Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job." *Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 F. App'x 727, 729 (3d Cir. 2009) (citing *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000)). This is particularly true where, as here, a Financial Advisor is required to meet with unscheduled customer referrals who may be brought over by the Branch Manager, as well as customers whose appointments are scheduled for the Financial Advisor by branch employees and placed on the Financial Advisor's calendar. Appx822-823, SOF ¶¶9, 10. Indeed, the personal connection is an essential part of building the trust necessary for customers to feel comfortable enrolling in PNC investment-related products and services, which is why PNC requires Financial Advisors to maintain regular in-person hours at their assigned branches. Appx825, ¶12; *see Miller*, 350 F. App'x at 729 (finding attendance was an essential function of the job for employee whose job required her to assist during surgery); *Johnson v. Children's Hosp. of Phila.*, No. 94-5698, 1995 WL 338497, at *2 (E.D. Pa. June 5, 1995) (holding plaintiff could not perform essential functions of his position as an aide in the radiology department when he frequently showed up to work late). Moreover, as O'Brien testified, Financial Advisors are prohibited from working from home and are expected, with limited exceptions, to work in the branch, to inform the branch when absent, and that these

requirements were essential to the Financial Advisor position. Appx824, 827-828, SOF ¶¶11, 15, 16.

Appellant's argument that his "job required that he work at night and early in the mornings (outside of normal business hours)" actually bolsters PNC's point that there were "normal business hours." *See Albright v. Trustees of Univ. of PA*, No. 19-00049, 2019 WL 5290541, at *6 (E.D. PA Oct. 18, 2019) (holding that employee who was regularly late to work without notice failed to show he was qualified for his position based upon supervisor's testimony that showing up on time and maintaining appointments was an essential function of his position). Indeed, his argument that regular attendance was not an essential job function because he sometimes worked from home does not address whether he was *permitted* to do so. As the District Court noted, O'Brien testified that Financial Advisors are not permitted to work from home and there is no contrary evidence in the record "other than [Appellant's] say-so." Appx6 at n. 4; *see also* Appx604, O'Brien Dep. 131:16-24; Appx904, O'Brien Dec. ¶7; Appx824, SOF ¶11. Moreover, Appellant also does not refute that O'Brien expected him to be in the branch (*ie*, have regular attendance) and, if not, to call-in. Appx393, 406-407, Pl. Dep. 157:8-18, 170:14-171:18; Appx855, SOF ¶49. Appellant also admitted the Absences and Tardiness Policy applied to him, showing he understood physical presence was expected. Appx262-263, Pl. Dep. 26:23-27:5.

In his opening brief, Appellant mischaracterizes PNC's arguments regarding the attendance expectations by claiming that O'Brien required him to be in the branch "every day" and "sit[] in a chair from 9:00 a.m. to 5:00 p.m." without exception, and would not permit him to work away from the branch even though he did so regularly. O'Brien, however, acknowledged that Financial Advisors may not be present in the branch if they were meeting a client or at a client function, but that they were required to inform the branch of their location so that the branch would not schedule clients while the Financial Advisor was out of the branch. Appx607-609, O'Brien Dep. 134:5-136:15; Appx171, Rhome-Smith Dep. 46:5-23; Appx822-823, SOF ¶¶9, 10. In other words, even if he could do some work at home, that does not mean physical presence was not essential. *Holmes v. Cemcolift Inc.*, No. CIV.A.05 421, 2006 WL 2927642, at *4 (E.D. Pa. Oct. 11, 2006) (physical presence essential "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home").

Appellant also argues the Court should ignore his repeated failure to utilize the Company's call-out procedures as instructed because those procedures were created for and applied only to him, and "imposed almost immediately" after he returned from his second FMLA leave on August 30, 2017. Yet the call-out procedures (requiring Appellant to inform O'Brien if he would be taking a day off) applied to all Financial Advisors. Appx905, O'Brien Dec. ¶12; Appx509-510,

O'Brien Dep. 36:24-37:13; Appx149-150, Rhome-Smith Dep. 24:9-21. O'Brien, however, did not have to discipline or formally set call-out procedures (requiring Appellant to inform O'Brien and the branch if he would be late or leaving early) for any other Financial Advisor because she was unaware of any other Financial Advisor under her supervision who repeatedly failed to show up to their branch when expected or failed to repeatedly show up for meetings. Appx510-512, O'Brien Dep. 37:24-39:22.

Finally, Appellant also argues that these procedures could not be essential to his job because they were not set forth in a formal written policy and were allegedly communicated to him very soon after he returned to work from the alcohol-related car accident in late October 2017. This timing argument is irrelevant. Although PNC argues Appellant was notified *before* his second leave,[4] there is no dispute that he *was aware* of O'Brien's call-out expectations prior to the verbal warnings in January, February, April, and May 2018 (Appx905, O'Brien Dec. ¶¶12, 14; Appx881-882, SOF ¶120), the final written warning on June 7, 2018 (Appx391-393, Pl. Dep. 155:13-22, 156:6-13, 157:8-18), and when, on June 25, 2018, he did not report for

---

[4] *See* Appx510, O'Brien Dep. 37:4-13 (O'Brien told Appellant, prior to his first FMLA leave, to notify her and the branch if he would be late to work, leaving early, or had a medical appointment); *see also* Appx904, O'Brien Dec. ¶10. (O'Brien counseled Appellant and gave him a verbal warning in May 2017 that his attendance must improve and that he needed to maintain his regular in-person hours at the Branch).

work and he did not call or contact O'Brien prior to his absence (Appx406, Pl. Dep. 170:14-22), resulting in his termination. Moreover, Appellant's claim that O'Brien imposed these or other expectations shortly after his car accident because she knew about his alcoholism and that he was intoxicated during the accident is belied by the record. As Appellant admitted, "neither O'Brien not any others person at PNC Investments knew of Mr. Drizos' intoxicated state until he testified to the same at his deposition and thus that information could never been relied upon as part of any discipline." Appx364-365, Pl. Dep. 128:18-25, 129:4-13; Appx843-844, SOF ¶38.

Appellant's continued failure to come to work on time, his repeated absences from the branch, and his failure to follow call-out procedures as instructed meant that he could not perform an essential function of his job and was not meeting PNC's or O'Brien's legitimate performance expectations. Appx83-832, 843-858; SOF ¶¶19, 21, 38, 40-41, 43-48, 51-52. Appellant's unwillingness or inability to follow PNC's attendance and call-out policies demonstrates that he was not otherwise qualified for the Financial Advisor position. Accordingly, Appellant cannot establish a *prima facie* case of discrimination.

### B.    Appellant Cannot Show Pretext

Even if Appellant could establish a *prima facie* case (he cannot), his claims nonetheless fail because he cannot establish pretext.[5] An employee may establish

---

[5] PNC relies on the arguments set out in this section to establish that Appellant has

pretext by showing the employer was more likely than not motivated by a discriminatory reason or by proffering evidence that the employer's reason is simply not credible. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). This, Appellant cannot do.

### 1. Appellant's Violation Of His Final Warning Was The Sole Reason For His Termination

Appellant cannot offer any evidence that his termination was for any reason other than his admitted violation of his final written warning. After being recently and repeatedly counseled for failing to show up at the branch and not following call-out procedures, Appellant admits he was absent from work on May 31 and June 1, 2018, and did not let O'Brien know that he would be absent *prior to* his start time. Appx391-392, Pl. Dep. 155:23-156:12; Appx853-854, SOF ¶47. Based upon these absences and O'Brien's prior warnings to him, on June 7, 2018, O'Brien placed Appellant on a final written warning. Appx855, SOF ¶48. The final written warning (again) clearly outlined PNC's expectations for his future behavior. Appx855, SOF ¶49.

Appellant admits that he understood the clear expectation that he was required to call before the start of the workday if he was not going to be in the branch on a

---

also produced no evidence satisfying the third prong of his *prima facie* case—that he was subjected to an adverse employment decision as a result of intentional disability discrimination.

particular day. Appx393, 406-407, Pl. Dep. 157:8-18, 170:14-171:18; Appx855, SOF ¶49. Despite this understanding, however, Appellant also admits that he violated his final written warning by being absent on June 25, 2018, and failing to adhere to that requirement.[6] Appx406-407, Pl. Dep. 170:14-22, 171:8-13. As the District Court concluded,

> It is unclear how Plaintiff's termination can be discriminatory and related to his alcoholism when he readily admits that he knew he was on a final written warning, he knew he could be terminated for another violation of PNC's policy and admits that he indeed committed a violation of that policy.

*See* Appx6.

### 2.    Appellant's Allegations Of Pretext Are Belied By The Record

Appellant presents numerous unfounded theories questioning the legitimate basis for his termination. Each of these arguments is a red herring, and fails to establish that PNC's reason for his termination was pretext for intentional disability discrimination.

---

[6] Appellant takes issue with the phrase "report to work" because he claims he was working from home that day. However, what it means to "report to work" is immaterial. What the undisputed record shows is that Appellant testified "I failed to let anyone know where I was going to be during that day." Appx406, Pl. Dep. 170:20-23.

a.    Appellant admits he never had a "warm" relationship with O'Brien

Appellant argues the workplace changed after he took his second leave, including that O'Brien allegedly became "cold" and "toxic" towards him. But his own testimony completely undermines this argument because he testified that he and O'Brien never got along from the moment he began reporting to her. He said, "There was never any warmth," and that others would agree. Appx306, Pl. Dep. 70:17-20. He also testified, "[I] don't think she liked me from day one." Appx308, Pl. Dep. 72:4-10.

b.    Any alleged increased scrutiny of Appellant following was based solely upon Appellant's own behavior.

Any additional scrutiny of Appellant above that of other Financial Advisors was based solely in response to his own behavior and is not evidence of pretext. The undisputed record shows that prior to and shortly after his second leave, Appellant had poor attendance and failed to notify O'Brien when he was going to be absent.[7]

---

[7] At his deposition, Appellant did not deny his various absences and failure to call-out prior to his second leave. Instead he simply testified he could not *recall*. Appx509, O'Brien Dep. 36:12-16; Appx339-340, Pl. Dep. 103:16-24, 104:2-7; Appx826-827, 831, SOF ¶¶14, 21. It is undisputed that Appellant was absent for two days after his car accident and that he did not call-out during those days either and did not have anyone else call on his behalf. Appellant cites to his own affidavit for the claim that O'Brien was aware of the car accident on October 23, 2017, the day it occurred. The affidavit adds details to his deposition testimony, in which he mentions that he believed his ex-wife and O'Brien spoke while he was in the hospital, but never mentions what day. Appx364-365, Pl. Dep. 128:18-129:3. Instead, O'Brien had to call his ex-wife on the second day to find out where he was.

It is also undisputed that O'Brien did not have to discipline or formally set out call-out expectations for any other Financial Advisor because no other Financial Advisor under her supervision repeatedly failed to show up to their branch when expected; and, unlike Appellant, none failed to show up for meetings with PNC employees or clients without notice and on multiple occasions. Appx. 848-849, SOF ¶42. Additionally, no other Financial Advisor under O'Brien failed repeatedly to notify her and/or their branch when they were absent, and none were repeatedly unreachable via telephone or email. Appx. 848-849, SOF ¶42. Thus, while Appellant claims he was treated differently by being subject to additional requirements or scrutiny by O'Brien, he has not and cannot identify a single other Financial Advisor who had the same attendance and tardiness issues that he did who was not similarly disciplined or required to call-out when they would be absent from or late to work. *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. Appx. 220, 222 (3d Cir. 2009) (stating that, while "similarly situated" does not mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects," which often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or

---

Appx282-284, Pl. Dep. 46:11-48:4. In any event, the particulars of when O'Brien learned why he was absent are immaterial. Appellant also did not recall whether or not he was 30 minutes late to a quarterly sales meeting in February 2018, as O'Brien testified. Appx905, O'Brien Dec. ¶12;  Appx371, Pl. Dep. at 135:16-139:20.

mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)). Any additional supervision of Appellant was not based upon his alleged disability, but rather was based upon his own behavior as is demonstrated by the progressive disciplinary actions for continued absences from his Branch without notification, missed meetings and failure to improve despite repeated warnings. *See Kaiser v. Zurich N. Am.*, No. 12-CV-6763(VSB), 2015 WL 13360299, at *10 (S.D.N.Y. Mar. 31, 2015) (if "[d]efendant [] subjected [p]laintiff to heightened supervision, the only logical inference that could be drawn from such scrutiny is that [his] chronic performance problems warranted such scrutiny, not that such scrutiny was the result of [discrimination]") (internal citations omitted).

Appellant claims he was placed on a "heightened supervision plan so that he could be monitored by numerous individuals for potential investment fraud." But the factual record does not support this. Neither Rhome-Smith nor O'Brien ever confirmed that Appellant was actually placed on such a plan. Instead, O'Brien testified that such a plan was discussed. Appx184, Rhome-Smith Dep. 59:11-14; Appx568, O'Brien Dep. 95:14-22. Appellant also claims O'Brien was considering such a plan because she was concerned he would commit investment fraud. In fact, she testified the opposite. When specifically asked, "Was there ever a concern that

Stephen Drizos might commit some type of financial crime because of the situation he may be in," O'Brien responded, "No." Appx570, O'Brien Dep. 97:15-23.

Appellant's argument regarding the alleged timing of the "heightened scrutiny" is also misplaced, as (1) it undisputed that he was aware of O'Brien's call-out expectations prior to numerous verbal warnings (and certainly by the time he was on a final written warning); (2) O'Brien was unaware at the time that the car accident was a DUI; (3) the weekly check-in calls were discussed with Appellant and O'Brien considered "heightened supervision" in February 2018, more than half a year *after* Appellant's return from his second leave in August 2017.[8] Appx579, O'Brien Dep. 106:8-11; Appx799-801.

---

[8] Appellant cites a February 2018 email showing O'Brien telling others that she is "looking for insight into specific intention for this call [with Drizos], if any, that would be different or would distinguish this connection from the typical connection I have with FAs regularly." This indicates not that she was looking for a way to "treat Mr. Drizos differently", as Appellant suggests, but to distinguish the check-in call concerning the issues she was seeing with the normal check-ins she has with financial advisors (including those she had with Appellant). Moreover, Appellant mischaracterizes and overstates the contents of this document to the extent it implies that she was looking to discuss these additional meetings as a result of him returning from his second leave of absence. He returned from FMLA in August 2017 and the dates in this email chain are in February 2018, almost 6 months later. Appx800-801.

c.    <u>Appellant's argument that he was previously allowed to work from home and was able to do his job without calling-in does not establish pretext.</u>

Appellant argues his termination was pretextual because at some point before his second leave of absence, he was allegedly allowed to work from home without restrictions and because he was able to do his job adequately (according to him) without following O'Brien's expectations. This argument is also unavailing. Appellant alleges that Rhome-Smith only expected him to be available by phone or email if he was not physically present in the Lebanon Shops Branch. Yet Rhome-Smith did not testify about working from home, and there are a host of reasons (e.g., meeting with a client, attending a work-related event) why a Financial Advisor might not be physically at the branch and need to stay in contact with his/her manager and co-workers. O'Brien also acknowledged that Financial Advisors may not be present in the branch if they were meeting a client or at a client function, but that they were required to inform the branch of their location so that the branch would not schedule clients while the Financial Advisor was out of the branch. Appx607-609, O'Brien Dep. 134:5-136:15; Appx171, Rhome-Smith Dep. 46:5-23; Appx822-823, SOF ¶¶9, 10. That does not mean that Appellant or any other Financial Advisor *were permitted* to work from home. Indeed, Appellant's subjective opinion about whether he could do his job without regular attendance or complying with O'Brien's expectations is also irrelevant. As the District Court concluded,

> [T]hat Plaintiff may feel that the decision to terminate him for violating the call-out procedures was wrong or mistaken — because he believed he was still able to do his job without adhering to these procedures — does not make it discriminatory.

*See* Appx7.

Most importantly, however, the argument that Appellant was permitted to work from home and that it was not important for him to be physically present at the Branch is irrelevant, as the District Court also noted, because the reason for his discipline and termination was his failure to follow the call-out procedures, not because he was working from home. *See* Appx6.

> d.    Appellant's attempt to cast doubt on the legitimacy of the verbal warnings and final warning does not establish pretext.

Appellant's disputes regarding the various verbal warnings prior to his final warning cannot establish pretext because they are unrelated to his request/use of FMLA or ADA leave and do not undermine the reasons offered for his final warning or termination. Moreover, his claims about the verbal warnings simply mischaracterize the record. He implies the verbal warning in January 2018 was somehow connected to his mental health treatment. Yet the cited document notes that the verbal warning was issued to Appellant for "not informing [O'Brien] directly that" he was going to miss work. Appx881-882, SOF ¶120. O'Brien testified that this verbal warning was due to a "pattern of behavior we did not see improving," and not just based on a single instance of failing to inform her that he was going to

miss work. Appx560-561, O'Brien Dep. 87:2-88:18. More importantly, Appellant's mental health treatment is not relevant to the disability (alcoholism) or leave requests at issue in this case.

He was also counseled in April 2018 for failing to follow proper call-out procedures when he did not call O'Brien to inform her that he would not be in the morning of April 11. Appx905, O'Brien Dec. ¶13. Appellant counters that notes about a text message he sent show that O'Brien was aware of this absence. Yet part of the text message relates to a different absence and another part indicates that someone at PNC reached out to him in his absence, and his response was that he had worked from home that morning. Indeed, the next line in the exhibit Appellant cites is "did not tell Wendy [O'Brien] despite being told to." Appx764. Relatedly, the birth of Appellant's daughter on April 10 and whether Rhome-Smith and O'Brien were aware is immaterial to whether he followed the correct call-out procedures.

The record also shows that Appellant took vacation on May 17 and May 18, 2018, without informing Rhome-Smith that he would be out of the Branch, which caused him to miss several pre-set client appointments. Appx905, O'Brien Dec. ¶14; Appx850-851, SOF ¶44. Appellant attempts to deny this, but he actually testified he did not *recall* whether he took those vacation days without notice or if he missed prescheduled appointments. Appx389, Pl. Dep. 153:5-21; Appx850-851, SOF ¶44. Appellant was also counseled by O'Brien for failing to inform her that he would not

be in the Branch until the afternoon on May 24. Appx905, O'Brien Dec. ¶14. Appellant cites handwritten notes from Lori Lockard to deny this claim. But just because the document Appellant chose to quote does not mention that he failed to call out, does not mean it did not occur or that he did not receive verbal counseling for it. Appx852-853, SOF ¶46.

Finally, Appellant's arguments concerning *why* he was absent on May 31 and June 1 (to take care of his sick baby) do not address whether he failed to let O'Brien know *before* he was going to be absent and are thus immaterial. The email dated May 31 to O'Brien and others about taking a "personal day today" was sent at 10:48 am, several hours *after* his work day commenced and does not say anything about being absent the following day. The final written warning also specifically references absences on May 31 and June 1 as its basis, and Appellant explicitly read this portion of the written warning during his deposition and acknowledged that he signed and did not dispute receipt of the final written warning. Appx853-856, SOF ¶¶47-50.

       e.      PNC's handling of Appellant's managed account reviews was done pursuant to PNC's policies and is not pretext for discrimination.

PNC's management of Appellant's account reviews while he was on FMLA leave is not evidence of pretext. PNC and each Financial Advisor have a fiduciary responsibility for managed accounts and are required by financial regulations to

conduct a yearly review of managed accounts with the client account holder. Appx833, SOF ¶25. PNC could not transfer Appellant's accounts to another Financial Advisor during his leave because to do so would cut off Appellant's trailing revenues from those accounts and deny Appellant his main source of compensation while he was on leave. Appx834-835, SOF ¶27. Accordingly, to assist Appellant during his leaves, PNC requested that other Financial Advisors cover Appellant's account reviews *without compensation* in order to assist in trying to keep Appellant's hundreds of accounts up to date. Appx835-836, SOF ¶28. Up to three Financial Advisors assisted in the review process at any given time during Appellant's leave.  Appx836-837, SOF ¶29. O'Brien herself assisted by entering all of the account review notes from each account meeting by the covering Financial Advisors into PNC's system. Appx838-839, SOF ¶31. Because Appellant had approximately 350 clients in 2017, and reviews take approximately an hour and thirty minutes to complete, O'Brien testified that while they could not cover all of Appellant's reviews, they conducted as many reviews as they could during Appellant's absence. Appx833-834, 838-839, SOF ¶¶26, 31. While, for regulatory reasons, O'Brien encouraged Appellant to complete his reviews as soon as possible upon his return from leave, O'Brien granted Appellant *multiple extensions* to complete his reviews, and Appellant admitted that he did not request help in completing his reviews once he returned. Appx839, SOF ¶32. And, in any event,

Appellant's claims concerning the accounts reviews and related workload are immaterial as they are wholly unrelated to his request/use of FMLA or ADA leave or to his termination or the basis for that decision.

       f.     <u>O'Brien did not "scheme" to take Appellant's accounts.</u>

Appellant also argues that O'Brien "schemed" to "divest" him of accounts after his second leave. This argument is based largely on a mischaracterization of O'Brien's deposition testimony and a related exhibit, which do not indicate a scheme or that she was divesting him of managed accounts. Rather, the evidence cited shows that O'Brien was making plans to ensure his accounts "would be covered" and properly attended to in the event Appellant had another extended leave of absence for any reason in order to avoid them becoming delinquent—an issue Appellant himself complained about after returning from leave and now cites as evidence of discrimination and interference. Appx564-567, O'Brien Dep. 91:17-94:14; Appx797. Indeed, when O'Brien was notified that Appellant's accounts could not be formally transferred, she dropped the issue and instead made contingency plans in case Appellant were to take another leave and not return. Appx567, O'Brien Dep. 94:7-14. Regardless, O'Brien's plans to cover Appellant's accounts (or her testimony about who ultimately received some of his accounts after his termination)[9]

---

[9] It is undisputed that O'Brien hired Anthony Caruso. But she did not testify that she gave his "entire" book of business to Caruso after Appellant was terminated—she testified the opposite: "[Caruso] inherited those clients that belonged to the Lebanon

is immaterial because as they are wholly unrelated to his request/use of FMLA or ADA leave or to his termination or the basis for that decision.

g.    Appellant's perception of alleged "harassment" by Rhome-Smith and O'Brien does not establish pretext.

When asked how often she reported to O'Brien about Appellant's attendance, Rhome-Smith testified that she only reported his "whereabouts" "[i]f it was significant," and she explained that she did not keep any notes about Appellant's whereabouts, belying the notion that her behavior was "intrusive or disruptive" or that the behavior was "harassment." Appx206-208, Rhome-Smith Dep. 81:17-83:3. Indeed, the testimony cited by Appellant for his claim that Rhome-Smith and O'Brien, after his second leave of absence, called him incessantly to check on him recounts *a single lunch* during which he received calls from them. Appx303, Pl. Dep. 67:3-8. Appellant's claim that O'Brien told him he was to "constantly report[] his whereabouts" "because of his second leave of absence" is also misleading. The citation only indicates that O'Brien had a conversation with him about following the call-out procedure "after" his second leave to help him "stay on the right track", not "because of" his leave. Appx306, Pl. Dep. 70:10-15. Moreover, any alleged "micromanaging" upon his return from the second leave was not an adverse action.

---

Shops branch. He did not inherit the entire book." Appx550-551, O'Brien Dep. 77:24-78:2.

*See Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x. 226, 230 (3d Cir. 2008) (supervisor's "unpleasant and annoying" scrutiny was not materially adverse). In any event, Appellant's perceptions that he was being "harassed" by his managers or felt "ignored" by O'Brien are wholly unrelated to his request/use of FMLA or ADA leave and do not dispute or undermine the reasons offered for his final warning or termination.

        h.    Appellant's alleged notification that he "may" take leave at some point in the future does not establish pretext.

Appellant's alleged conversations with O'Brien several months prior to his termination that he was "having difficulties" are insufficient to demonstrate that PNC's legitimate, non-discriminatory reason for his termination was pretextual. When asked to state specifically what he conveyed to O'Brien in his alleged final request, he said, "I didn't want to take a leave per se, I had mentioned that I was going to potentially go and do evening rehab so it wouldn't interfere with work and I could stay local" (Appx395-396, Pl. Dep 159:24-160:16), as "I was having difficulties again and did not know exactly what I was going to do, but I knew I would probably end up doing something." Appx397, Pl. Dep. 161:12-19.

Appellant's factual averment in his affidavit that he told O'Brien that it would take him a few weeks to determine how he could take another leave and reserve a bead at Betty Ford clinic contradicts his prior deposition testimony and therefore cannot create a disputed issue of material fact. Notably, Appellant did mention he

needed to reserve a bed at Betty Ford in his prior deposition, but he never states that he explained this to O'Brien. Appx397-400, Pl. Dep. 161:12-21, 163:24-164:8. Thus, the alleged details he provided in his affidavit contradict his testimony about what he "specifically" told O'Brien during this time. Appellant also claims that when he told O'Brien that "he intended to take another leave," she "sighed" and "became visibly upset and frustrated." As the discussion above demonstrates, however, Appellant never actually disclosed to O'Brien his intention to take another leave. Moreover, any such reaction over a month before his termination is a stray remark, which fails to show pretext, and also do not undermine the reasons offered for his final warning or termination.

Appellant implies that because he was abusing alcohol and allegedly discussed a potential leave with O'Brien at some uncertain and undisclosed future date, that PNC should not have held him responsible for his repeated absences and failure to utilize call-out procedures as he had been repeatedly instructed to do. However, Appellant's supposed conversations with O'Brien within months of his termination are insufficient to establish pretext because employers "may hold an employee who is an alcoholic to the same standards of performance and behavior as non-alcoholics." *RHJ Med. Ctr. v. City of DuBois*, 754 F.Supp.2d 723, 757 (W.D. Pa. 2010.); 42 U.S.C. § 12114(c)(4). Moreover, Appellant, who had taken two

previous extended leaves[10] and admits that he knew the intricacies of the leave process, never actually requested a leave of any kind prior to his termination. Appx858-859, SOF ¶54. Indeed, Appellant did not ask for any accommodation, and did not apply for FMLA or any other kind of leave until a week _after_ PNC terminated his employment. Appx858-859, SOF ¶54. During the months preceding his termination of employment, however, Appellant admittedly violated PNC's attendance and call-out procedures and violated his final written warning, resulting in his termination. Appx856-858, SOF ¶¶51-52. Thus, Appellant's allegations that he discussed a possible leave in the future cannot insulate him from legitimate performance management and is insufficient to establish pretext.

### 3.    There is Overwhelming Evidence Disproving Any Discriminatory or Retaliatory Animus

Contrary to Appellant's attempt to fabricate baseless arguments for pretext, the facts in this case show a _clear lack_ of discriminatory or retaliatory animus. For instance: O'Brien assisted in the review of his accounts, ensured that other Financial Advisors helped as well, gave Appellant additional time and extensions to complete the work, did not terminate his employment in January 2018 when she found out that

---

[10] Appellant's FMLA leave, which he took starting May 30, 2017, was extended twice, requiring Appellant to reach out to PNC's leave administrator a total of three times to obtain the full leave (once for his original request, and twice for two, thirty day extensions).

he violated FINRA regulations by failing to report an arrest for his admitted cocaine use, did not terminate or discipline him for receiving a second DUI in April 2018, and gave him numerous verbal warnings and followed a progressive disciplinary process. In addition, PNC allowed Appellant to take two leaves for alcoholism, and there is no evidence that any other Financial Advisor was treated more favorably under similar circumstances. Given these facts, no reasonable jury could conclude that PNC would not have accommodated/approved Appellant's FMLA or ADA leave request again, that PNC's proffered reason for the termination was false, or that O'Brien terminated Appellant's employment because of his alcoholism or alleged request for FMLA or ADA leave.

## III.   Appellant's Failure to Accommodate Claims Also Fail As A Matter Of Law

To establish a *prima facie* case of failure to accommodate under the ADA and PHRA, a plaintiff must allege that (1) he was disabled and his employer knew it; (2) he requested an accommodation; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017). Appellant cannot establish the second, third or fourth prongs of a *prima facie* case, and so his failure to accommodate claim fails as a matter of law.

Appellant cannot establish a *prima facie* case of failure to accommodate because he did not request an accommodation from PNC. The District Court

concluded that Appellant did request an accommodation because "a request for FMLA leave may qualify, in certain circumstances, as a request for a reasonable accommodation under the ADA." *See* Appx10, citing *Capps* at 156). While that is a correct statement of law, it is not applicable to this case.

Despite the interactive process being "fairly lenient, it nonetheless places the burden to initiate [] upon" Appellant. *McLean v. Abington Mem'l Hosp.*, No. CV 15-671, 2015 WL 5439061, at *7 (E.D. Pa. Sept. 15, 2015). As noted above, the undisputed record shows that Appellant never requested an accommodation, even when asked to state specifically what he conveyed to O'Brien in his alleged final request. While Appellant stated that he "may" take a leave or even that he planned an unspecified future leave, he did not request FMLA, any other kind of leave, or a different accommodation prior to his June 2018 termination. Appellant's vague, indefinite statements do not amount to an accommodation request.[11] *See Brown v. Chase Brass & Copper Co.*, 14 F. App'x 482, 487 (6th Cir. 2001) (vague references insufficient); *Beverly Gagne, v. SAFE Fed. Credit Union*, No. CV 3:18-208-JMC-PJG, 2020 WL 2476651, at *6 (D.S.C. Jan. 30, 2020) ("vague plea" insufficient).

---

[11] Appellant knew how to make requests for leave—he simply failed to do so prior to his termination, belying the idea that he intended these vague statements to constitute a request for an accommodation. Appx405, Pl. Dep. 169:10-12. Indeed, Appellant admits he called the "number that I normally call" to make a "formal" request for leave after his termination. Appx405, Pl. Dep. 169:15-18.

90330546v.2

Moreover, however, as the District Court concluded (Appx9), Appellant cannot show that PNC failed to make an effort to assist him when he never requested a leave or other specific accommodation. And because he did not request an accommodation prior to his termination, any argument that he may assert alleging that he could have been accommodated would be speculative at best. Appellant also does not allege that he requested to start any leave before his final warning or before the date of his termination. Therefore, any failure to accommodate a post-termination leave was made moot by the legitimate termination decision.

## IV.    Appellant Cannot Establish a *Prima Facie* Case of Retaliation Under Any Statute.

To establish a *prima facie* case of retaliation under the ADA and PHRA, a plaintiff must show that: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer took adverse action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. To establish an FMLA retaliation claim, a plaintiff must show that (1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights. *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014). It is Appellant's burden to establish causation. On that issue, Courts consider (1) an unusually suggestive temporal proximity or (2) a pattern of antagonism towards the plaintiff for taking FMLA leave. *Capps v.*

*Mondelez Glob., LLC*, 847 F.3d 144, 152 n. 6 (3d Cir. 2017). Appellant's ADA, PHRA, and FMLA retaliation claims all fail for similar reasons.

Appellant's retaliation arguments are unavailing. He argues that he disclosed his intent to take another leave on "multiple occasions." However, as noted above, his testimony illustrates he did not make a definitive leave request and, thus, cannot demonstrate that he engaged in protected activity. Thus, at best, Appellant articulated a potential future intention to assert his rights under the ADA or FMLA, but did not do so.

Even assuming, *arguendo*, that Appellant's supposed April, May or June 2018 discussions about a future leave of absence can be considered protected activity, his claims still fail because no causal link exists between his alleged protected activity and the termination of his employment. As numerous Pennsylvania federal courts have recognized, "intervening workplace impropriety breaks the chain of causation between protected activity and retaliatory acts." *Drwal v. Borough of West View, Pa.*, 617 F. Supp. 2d 397, 424 (W.D. Pa. 2009) (citing *Ober v. Miller*, No. 04-CV-1669, 2007 WL 4443256, at *12 (M.D. Pa. Dec. 18, 2007)). Thus, even if Appellant engaged in protected activity by informing PNC in April or June of 2018 of a future medical leave, his admitted violation of his final written warning on June 25, 2018 is an "intervening workplace impropriety" that breaks the causal chain between any protected activity and Appellant's termination.

90330546v.2

Appellant misconstrues PNC's argument about the lack of a causal link between his alleged protected activity and his termination. PNC does not argue that the *termination* was an intervening event. Rather, as the District Court noted (Appx8), it was Appellant's undisputed violation of his final written warning that *led to his termination* and broke any causal chain. And, PNC granted and extended his prior leave requests on several occasions, reinforcing that it was not hostile to him requesting or using leave. This willingness to grant and extend leaves counters any argument of hostility. *Williams v. Graphic Packaging Int'l, Inc*., No. 1:16-CV-00102, 2018 WL 2118311, at *8 (M.D. Tenn. May 8, 2018) (no evidence of pretext for FMLA retaliation where "[p]laintiff utilized FMLA rights for cancer treatment with Defendant's approval"); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 17 (1st Cir. 1997) ("[E]vidence that an employer willingly granted an employee's request for an accommodation, though by no means dispositive of the matter, tends to militate against making an inference of retaliation").

Furthermore, Appellant cannot establish causation even in the absence of the intervening termination. Almost two months passed between any purported protected activity and Appellant's termination, which is temporally too attenuated to establish causation. *Drwal*, 617 F. Supp. 2d 397, at 421 (finding that a time span of several months is too great to permit inference of causation); *George v. Genuine Parts Co*., No. 3:04-108, 2007 WL 217684, at *11 (W.D. Pa. Jan. 25, 2007) (finding

a three month gap is too long to establish causation). And, with the exception of O'Brien's stray remark "sigh", the remainder of Appellant's argument focuses entirely on alleged mistreatment *prior to* his alleged leave request, and therefore is necessarily outside of the causal chain between his purported protected activity in April/May 2018 and his termination. In other words, he does not argue—and the undisputed record does not show—that he suffered any "antagonism" after requesting leave either (again, assuming such requests constituted "protected activity"). Thus, he cannot demonstrate causation.

**V.    Appellant Cannot Establish Pretext With Respect to His ADA, PHRA, and FMLA Retaliation Claims, or that His FMLA Leave was a "Negative Factor" in the Termination Decision**

Even assuming that Appellant could make out a *prima facie* case of ADA, PHRA, and FMLA retaliation, he cannot establish that PNC's non-retaliatory reason for his termination is pretextual, as outlined above in Section II(B)-(C). For those same reasons and including the lack of causation arguments above in Section IV, Appellant also cannot establish a genuine issue of material fact as to whether his supposed request for FMLA leave several months before his termination was considered as a "negative factor" (as used in 29 C.F.R. § 825.220(c)) in the termination decision. *See, e.g.*, *Carpenter v. York Area United Fire & Rescue*, No. 1:18-CV-2155, 2020 U.S. Dist. LEXIS 67650, *23-25 & n.9 (M.D. Pa. April 17, 2020) (rejecting FMLA retaliation claim based on the "lessened causation standard"

due to the lack of indicia showing retaliatory animus and the lack of causal connection, which also supported dismissal of the FMLA retaliation claim based on pretext); *Wilson v. Providence Health & Servs.*, No. 3:14-cv-01091-JE, 2015 U.S. Dist. LEXIS 92317, *21-22 (D. Or. July 14, 2015) (Plaintiff failed to establish fact issue on whether prior FMLA leave was a "negative factor" in her termination, even though they occurred in "close temporal proximity," because "defendant's decision to terminate her employment was based entirely on her actions during the shift," which raised concerns about the safety of Appellant's patients which she did not deny). As the District Court noted, "Had he gotten to the point of specifically requesting FMLA leave for a specified period of time, give PNC's history with him, there is no evidence he would have been denied such benefits." Appx11.

## VI. Appellant's FMLA Interference Claim Fails As A Matter Of Law

To make claim of interference under FMLA, Appellant must establish: (1) he was eligible employee under FMLA; (2) defendant was an employer subject to FMLA's requirements; (3) plaintiff was entitled to FMLA leave; (4) plaintiff gave notice to defendant of his intention to take FMLA leave; and (5) plaintiff was denied benefits to which he was entitled under FMLA. *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F.Supp.2d 405, 446 (W.D. Pa. 2008). Appellant's sole argument regarding interference is that he was not returned to an "equivalent" position after his second leave because PNC "allowed his work to accumulate while on leave and

then required him to complete it immediately upon his return." This argument also fails as a matter of law.

Appellant's argument simply mischaracterizes the facts. PNC did not permit his work to "accumulate" unaddressed. As noted above, PNC requested and had at least three other Financial Advisors cover Appellant's account reviews in order to assist in trying to keep Appellant's hundreds of accounts up to date. O'Brien herself also assisted with this work, and testified that while they could not cover all of Appellants reviews, they conducted as many reviews as they could during Appellant's absence. Moreover, while O'Brien encouraged Appellant to complete his reviews as soon as possible upon his return from leave, she granted Appellant *multiple extensions* to complete his reviews, and Appellant admitted that he did not request help in completing his reviews once he returned.

Asking employees to catch up on worked missed during a leave of absence does not mean that the work has materially changed and certainly is not evidence of interference. As the Seventh Circuit recently held,

> [N]o rational finder of fact could conclude that asking a returning employee to catch up on missed emails and to catch up on directives and training missed during her absence amounts to the sort of 'make-work' that might indicate an intent to sideline or 'warehouse' an employee permanently. Nor could such a fact-finder conclude that asking her to catch up material she had missed deprived [Plaintiff] of the opportunity to participate fully in the responsibility, rewards, and satisfactions of the position for which she was hired.

*Anderson v. Nations Lending Corporation*, 27 F.4th 1300, 1305 (7th Cir. 2022); *see also Kollstedt v. Princeton City School Board of Education*, No. 1:08-CV-00822, 2011 U.S. Dist. LEXIS 7404, *15-19 (rejecting FMLA interference claim and finding that Appellant was "reinstated to her same job upon her return" from FMLA leave where the employer assigned other employees to cover some Appellant's work during the leave period, even though she was asked to catch up on some work upon her return, and noting: "the FMLA does not entitle employees to return from leave with a clean desk and an empty inbox").

Finally, Appellant admits that after his FMLA leave, he returned to the same role, same duties, same book of business, and same earnings and benefits as before he took leave. Appx349-350, Pl. Dep. 113:12-114:3. Under these facts, no reasonable jury could conclude that Appellant was not returned to an "equivalent" position.

## VII.  Conclusion

For the reasons set forth above, PNC respectfully asks that the Court affirm the District Court's Order and entry of judgment in favor of PNC.

90330546v.2

DATED:  December 19, 2022        Respectfully submitted,

SEYFARTH SHAW LLP


By: /s/  Esteban Shardonofsky

    Esteban Shardonofsky (TX No.
     24051323)
    *Admitted pro hac vice*
    sshardonofsky@seyfarth.com
    SEYFARTH SHAW LLP
    700 Milam Street, Suite 1400
    Houston, Texas  77002-2812
    Telephone:     (713) 225-2300
    Facsimile:      (713) 225-2340

    Attorneys for PNC INVESTMENTS
    LLC d/b/a PNC INVESTMENTS

90330546v.2

## COMBINED CERTIFICATION

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because the brief contains 10,383 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in plain, 14-point Times New Roman typeface; footnotes also appear in plain, 14-point Times New Roman typeface.

3.      This brief complies with L.A.R. 31.1(c) because the text of this electronic brief is identical to the paper copies.

4.      This brief has also been scanned by Cisco AMP for Endpoints Version 7.3.9 and no virus was detected.

5.      I certify pursuant to L.A.R. 46.1 that I am a member in good standing of the bar of this Court.


s/ Esteban Shardonofsky
Esteban Shardonofsky


Dated: December 19, 2022

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on December 19, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

Alec B. Wright, Esquire
Margaret S. Coleman, Esquire
O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA 15222

s/ Esteban Shardonofsky
Esteban Shardonofsky

90330546v.2