No. 22-1736

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

STEPHEN DRIZOS,

Appellant,

v.

PNC INVESTMENTS LLC d/b/a PNC INVESTMENTS,

Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 2:19-cv-01651

---

REPLY BRIEF OF APPELLANT

---

Alec B. Wright, Esquire
Pa. ID No. 316657

Margaret S. Coleman, Esquire
Pa. ID No. 200975

O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorneys for Appellant

# <u>TABLE OF CONTENTS</u>

ARGUMENT ..........................................................................................................1

   **I.**  **A reasonable jury could conclude that the new procedures, higher standards, and heightened scrutiny that PNC Investments imposed upon Mr. Drizos when he returned from the First Leave of Absence were discriminatory, and any violations thereof, pretextual** ....................................1

   **II.**  **PNC Investments provides only a circuitous, one-sided factual analysis intended to inappropriately prejudice and stigmatize Mr. Drizos in the workplace, and it does not provide support that its conduct was non-discriminatory** ..................................................................................................7

   **III.**  **PNC Investments cannot establish that call-out procedures were an essential function of Mr. Drizos' position** ..........................................................11

   **IV.**  **A reasonable jury could conclude that PNC Investments retaliated against Mr. Drizos (and otherwise failed to reasonably accommodate him)** 13

      **A. Mr. Drizos engaged in protected activity** ................................................13

      **B. A reasonable jury could conclude that PNC Investments terminated Mr. Drizos' employment in retaliation for requesting FMLA leave** ..........17

   **V.**  **The record establishes that PNC Investments interfered with Mr. Drizos' FMLA leave by failing to make reasonable provisions to complete his work in his absence** ...............................................................................21

**CERTIFICATE OF COMPLIANCE WITH RULE 32A** .................................25

**CERTIFICATION OF BAR MEMBERSHIP** .................................................25

**CERTIFICATION OF TEXT OF E-BRIEF** ..................................................25

**CERTIFICATION OF VIRUS CHECK** .........................................................25

**CERTIFICATE OF SERVICE** .......................................................................26

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Anderson v. Nations Lending Corp.*, 27 F.4th 1300 (7th Cir. 2022) ......................23

*Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694 (E.D. Pa. 2010) ...............................................................................................................14

*Coneen v. MBNA America Bank, N.A.*, 334 F.3d 218 (3d Cir. 2003) ......................9

*Egan v. Delaware River Port Auth.*, 851 F.3d 263 (3d Cir. 2017) .........................23

*Flory v. Pinnacle Health Hosps.*, 346 F. Appx. 872 (3d Cir. 2009).......................12

*Johnson v. Children's Hosp. of Phila.*, No. 94-5698, 1995 WL 338497 (E.D. Pa. June 5, 1995)................................................................................................12

*Kengerski v. Harper*, 6 F.4th 531 (3d Cir. 2021)............................................. 18, 19

*Kollstedt v. Princeton City Sch. Bd. of Educ.*, No. 1:08-CV-00822, 2011 WL 249496 (S.D. Ohio Jan. 26, 2011) ...............................................................23

*Lewis v. Sch. Dist. #70*, 523 F.3d 730 (7th Cir. 2008)...........................................23

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3d Cir. 2012).... 14, 15

*Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 F. App'x 727 (3d Cir. 2009) .............11

*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)................2

*Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398 (3d Cir.2007) ........... 15, 16

*Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Cir. 2003) ....................14

*Smith v. Davis*, 248 F.3d 249 (3d Cir. 2001) ..........................................................12

*Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276 (W.D. Pa. 2020) ....... 19, 20

*Thompson v. AT&T Corp.*, 2006 WL 89931 (W.D. Pa. Jan. 12, 2006)...................13

*Wojan v. Alcon Lab'ys, Inc.,* No. 07-11544, 2008 WL 4279365 (E.D. Mich. Sept. 15, 2008) ...................................................................................................23

## Statutes

29 U.S.C.A. § 2601 ................................................................................................21

# ARGUMENT

I.    **A reasonable jury could conclude that the new procedures, higher standards, and heightened scrutiny that PNC Investments imposed upon Mr. Drizos when he returned from the First Leave of Absence were discriminatory, and any violations thereof, pretextual[1]**

Despite PNC Investments' attempts to malign Mr. Drizos because of his alcoholism, he was an award winning and recognized employee of PNC. There is no evidence that Mr. Drizos ever missed a single meeting or appointment, except the self-serving statements of the woman who terminated him. But outside accepting O'Brien's word for it, PNC Investments cannot offer any evidence that Mr. Drizos was unqualified for his position. Mr. Drizos presented sufficient facts from which a reasonable jury could conclude that he was not terminated because he was a bad employee who failed to follow some *ad hoc* call-out procedure, but because he took leave to obtain treatment for alcoholism. To be sure, Mr. Drizos always remained one of the highest earning financial advisors in PNC Investments, and never missed any mandatory or prescheduled meetings.[2] He never even missed an opportunity with a prospective client walk-in.

---

[1] All defined terms herein are defined in the Principal Brief.

[2] For purposes of this Reply, whether Mr. Drizos was a qualified employee in connection with a *prima facie* case is argued in tandem with whether PNC Investments asserted legitimate, non-discriminatory reason for his termination was pretextual. Those legal principals, and the factual disputes concerning them in this record, are addressed in more detail in the Principal Brief.

A reasonable jury could conclude that O'Brien created the alleged call-out procedure for Mr. Drizos because of her discriminatory animus toward his disability. A reasonable jury could also find that he was terminated not for violating this discriminatorily created policy, but because of O'Brien's fear that he might take another leave of absence. But "[w]here there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Here, the following facts, some, or all of which are disputed, create material disputes regarding the reasons for Mr. Drizos' termination, which must be resolved at trial:

- Both before and after O'Brien became Mr. Drizos' supervisor, he worked remotely, when necessary, and she knew this fact and never complained or disciplined him for it. Appx466 at ¶ 3; *see also* Appx261, line 24 – Appx263, line17.

- Before the First Leave of Absence, the only expectation that was ever set for Mr. Drizos over attendance was that he be available by phone or email if he was not physically present at the branch, which he always was. Appx148, line 20 – Appx149, line 16.

- Mr. Drizos did not have a job description requiring him to be physically in an office during a specified time. Appx467 at ¶ 8; *see also* Appx301, lines 4-19.

- Mr. Drizos worked through the Intermittent Leave as though he was never on leave at all, so O'Brien did not feel any impact from him taking such leave. Appx334, line 18 – Appx338, line 25; *see also* Appx468 at ¶ 19-24; Appx768-769.

- Mr. Drizos took the First Leave of Absence from May 30 through August 30, 2017, and he was not permitted to work during it. Appx773-790; *see also* Appx791-796; Appx469 at ¶¶ 29-30.

- When Mr. Drizos returned, **only four of his managed accounts were reviewed** while he was out, causing around 70 managed accounts to become delinquent, and O'Brien told him that it was his sole responsibility to bring them out from delinquency. Appx469 at ¶¶ 31-32.

- At least one of Mr. Drizos' managed accounts became delinquent each day that he was out on leave from May 30 through August 30, 2017.

- At all relevant times, O'Brien discussed with Lockard the difficulties involved and her frustrations in reviewing managed accounts when a financial advisor like Mr. Drizos took a leave of absence. Appx500, line 21 – Appx501, line 5; *see also* Appx547, lines 12-17.

- When Mr. Drizos returned from the First Leave of Absence, O'Brien demanded that he adhere to weekly "check-ins" with her even though he did not do anything other than take a leave of absence to legitimize the implementation of such "check-ins." Appx470 at ¶ 37.

- O'Brien admitted that Mr. Drizos was the only financial advisor who was required to have weekly check-ins with her, and these "check-ins" were implemented so that he "stay on track" with his alcoholism. Appx470 at ¶¶ 38-39.

- Unbeknownst to Mr. Drizos, during the First Leave of Absence, O'Brien began creating a scheme whereby she planned to divest him of all his managed accounts if he ever took another leave of absence. Appx564, line 17 – 567, line 14; Appx797.

- In early October 2017, O'Brien recruited Caruso to PNC Investments as a financial advisor for the sole purpose of giving him all of Mr. Drizos' managed accounts if he ever took another leave of absence.

Appx548, line 18 – Appx549; *see also* Appx564, line 17 – Appx567, line 14; Appx797; Appx470 at ⸿ 37-39.[3]

- On October 23, 2017, Mr. Drizos was involved in a serious car accident and further restrictions were placed upon him when he returned. *See* Appx114 at ⸿⸿ 111-112; Appx115 at ⸿ 114.

- On January 25, 2018, O'Brien gave Mr. Drizos his first verbal warning for absences over the *ad hoc* "call-out procedure" after learning that he had obtained psychiatric treatment for alcoholism during the week of January 12, 2018. Appx798; Appx797.

- **The same day**, O'Brien placed him on "heightened supervision," claiming that he *may engage in some type of investment fraud*, even though there was no indication that he would engage in any such conduct (he was officially placed on heightened supervision around February 9, 2018). Appx799; *see also* Appx568, line 23 – Appx570, line 23.

- Under the heightened supervision plan, O'Brien directed PNC Investments to secretly check with branch and regional managers to monitor his attendance, participation, and kept appointments, looking for production spikes, randomly calling customers, checking for unexplained product changes, enhancing review of his accounts to see if he was trustee or beneficiary, and reviewing brokerage accounts for deposits and withdrawals. Appx800-801.

- **The very next day, on January 26, 2018**, O'Brien described her fear via email that Mr. Drizos might take another leave of absence, stating, **"Nevertheless it is a threat to my team's revenue performance this year but I can't yet count on Steve not going out again."** Appx566, lines 12-21 (emphasis added).

- O'Brien also stated, in part: **"I talked with ER about removing managed accounts from Steve so they would be covered should he go out again (they cannot be removed when an FA is out on a leave**

---

[3]When O'Brien terminated Mr. Drizos, she indeed gave his entire book of business to Caruso at the Lebanon Shops Branch. Appx550, line 7 – Appx551, line 4.

**since they are a source of revenue each month) but they were not comfortable with me doing that**." Appx797 (emphasis added).

- Even though O'Brien admits that she considered Mr. Drizos' physical absence to be excusable on January 25, 2018, Appx519, line 15 – Appx520, line 17, she told him that he was now required to notify both her and Rhome-Smith each time that he was not going to be in the office by 9:00 AM (**all of which stemmed from the fact that she learned he was going to counseling again**). Appx471 at ¶ 44.2.

- O'Brien told Mr. Drizos that the new "call-out procedure" was being applied to him *because he took a prior leave of absence so that he would "stay on track."* Appx306, lines 10-15.

- **Also, on January 26, 2018**, O'Brien asked Lockard, Foti, and Suhanic to provide her with reasons and/or ways in which she could justify treating Mr. Drizos differently than other financial advisors, stating, in part: "… *I'm looking for insight into specific intention for this call, if any, that would be different or would distinguish this connection from the typical connection I have with FAs regularly*." Appx800-801.

- According to Rhome-Smith, beginning in early 2018, O'Brien directed her to report all of Mr. Drizos' whereabouts, and although she did not say why, she told Rhome-Smith it was "important," even though Rhome-Smith was neither his supervisor nor an employee of PNC Investments. Appx206, line 17 – Appx207, line 17; *see also* Appx206, lines 17-25.

- The only time that Rhome-Smith reported to O'Brien that Mr. Drizos was not in the office occurred on May 17 and 18, 2018, when he was out of the office using vacation days that O'Brien had already previously approved. Appx765; *see also* Appx765 (O'Brien stating that, "Steve sent me an email early Friday morning saying he was taking a sick day but would be on his laptop doing things from home. Steve is not scheduled in Amy's branch on Fridays so he doesn't need to let her know, although it would be a smart courtesy since he frequently works there even though not scheduled to be there on that day. The Thursday and Friday Amy mentions below were scheduled vacation days (he went to DC with family.").

- Rhome-Smith never reported another time that Mr. Drizos was absent or tardy in more than two years. Appx765; Appx516, line 2 – Appx517, line 6; *see also* Appx516, line 2 – Appx517, line 6 (O'Brien stating that she was good about documenting any time that Rhome-Smith reported absences or tardiness related to Mr. Drizos.)

- On April 11, 2018, O'Brien claimed that Mr. Drizos violated the alleged "call-out procedure" when he was "late" for work <u>because his daughter had been born the day prior on April 10, 2018</u>, of which she (and Rhome-Smith) were well-aware and approved his absence and flexibility in his scheduling for his newborn daughter in exchange for the fact that Mr. Drizos was not taking the paternity leave he was entitled to through PNC Investments. Appx905 at ℙ 13; Appx471 at ℙ 49-51.

- Beginning in early or mid-May 2018, Mr. Drizos disclosed to O'Brien his intention to take another leave of absence to further address his alcoholism. Appx471 at ℙ 52; *see also* Appx802 (establishing conversation between O'Brien and Lockard on May 24, 2018, <u>during which Lockard was already under the impression that Mr. Drizos might be out on another leave of absence</u>); Appx471 at ℙ 53 (Mr. Drizos disclosed this intention to O'Brien multiple times in May 2018).

- When he told O'Brien that he intended to take another leave of absence, she "sighed" out loud and did not engage in the conversation, became noticeably upset and frustrated, and never spoke with Mr. Drizos about his intention to take another leave of absence. Appx472 at ℙℙ 55-56.

- On May 24, 2018, Lockard recorded a conversation with O'Brien in which it was noted that Mr. Drizos was improving and made no mention of any failure to "check-in" with O'Brien under the alleged call-out procedure. Appx766.

- Mr. Drizos took sick days for his newborn daughter on May 31 and June 1, 2018, for which O'Brien gave him the final written warning on June 8, 2018. Appx767; *see also* Appx472 at ℙ 57.

- As soon as he was issued the final written warning, Mr. Drizos officially informed O'Brien that he intended to take another leave of absence for alcoholism. Appx472 at ℙ 57.

- O'Brien terminated Mr. Drizos on June 28, 2018, claiming that he violated the alleged "call-out" procedures on June 25, 2018, by not calling her in the morning. Appx406, lines14-25.

- Mr. Drizos subsequently went to inpatient rehabilitation as he previously intended, successfully completed his treatment, and has remained sober to this day. Appx473 at ℙℙ 62-63.[4]

## II.    PNC Investments provides only a circuitous, one-sided factual analysis intended to inappropriately prejudice and stigmatize Mr. Drizos in the workplace, and it does not provide support that its conduct was non-discriminatory

Despite PNC Investments' repeated attempts to portray Mr. Drizos in a negative light by bringing up prejudicial issues with no bearing on his job performance, the only justification it has ever asserted for terminating him was for his alleged failure to follow the *ad hoc* call-out procedures. The only evidence it uses to support these supposed violations is the self-serving testimony of the person being accused of discrimination and whose testimony is flatly contradicted by the record.

---

[4] Mr. Drizos subsequently learned that he had sufficient days on which he could use short-term disability (combined with other leave days like vacation and occasional absence days) where he could have successfully entered inpatient rehabilitation before he was terminated. Appx472 at ℙ 58; *see also* Appx803-805 (stating that "[a]sof [July 3, 2018], and prior to the beginning of your leave date, you have 200 hours and 38 minutes of unpaid leave remaining under the Family & Medical Leave Act for the current 12 month period [sic], which is measured backwards from the first date leave was taken"); Appx806 (informing Mr. Drizos that had exhausted his Family Medical Leave and that his next eligibility date would be February 27, 2018).

PNC Investments' exclusive reliance on O'Brien accentuates the factual disputes that are at the heart of this case. Her testimony, when contrasted with Mr. Drizos' testimony and the record documentation, puts directly at issue why the *ad hoc* call-out procedures were created in the first place, and whether they were even legitimately violated.

It is critical to note that the record in this case establishes that Mr. Drizos never missed a client meeting (prescheduled or otherwise); never missed a prospective client meeting (scheduled or unscheduled walk-in); never came to work impaired; never lost business; and never missed a deadline. Moreover, he always increased his revenue for PNC Investments (except in 2017 where it remained flat because he took the First Leave of Absence); always ranked among the top performing financial advisors; always managed at least 350 clients with assets under management; and, always put clients' interests first. Even the asserted violations of the *ad hoc* call-out procedure are disputed and explainable such that a reasonable jury could conclude that O'Brien's implementation and enforcement of them was discriminatory.

For instance, the verbal warning that O'Brien issued to Mr. Drizos in October 2017 for allegedly violating her call-out procedures was for an absence over a serious car accident that O'Brien admitted was excusable. The first written warning on January 25, 2018, was because O'Brien learned that Mr. Drizos was seeking counseling for his alcoholism (prompting her fear that he might take another leave).

The second written warning on April 11, 2018, *the day after his daughter was born*, was because he was holding his newborn baby that morning and did not advise O'Brien of the same. The final written warning issued on June 8, 2018, was because he was at home attending to his sick newborn baby (which he previously received permission from O'Brien to do so in lieu of taking formal parental leave that PNC Investments offered). And his termination on June 28, 2018, was because he was ill from his disability, for which he was attempting to take another leave of absence, of which O'Brien was aware.

As it must, PNC Investments, continues to pivot away from the fact that it permitted Mr. Drizos to work remotely *without* "calling-out" or checking in for years prior to the First Leave of Absence. *See Coneen v. MBNA America Bank, N.A.*, 334 F.3d 218, 236 (3d Cir. 2003) (holding that an "employee's actual experience is also relevant to the inquiry" as to what is appropriately characterized an essential function). PNC Investments cannot offer any legitimate basis for implementing a new call-out procedure for Mr. Drizos because he did not violate any workplace rules to justify it before being implemented. To be sure, the only attendance-type issues on which PNC Investments justifies Mr. Drizos' termination were in connection with the *ad hoc* "call-out procedure," and nothing else.

PNC Investments also cannot offer any legitimate basis for targeting one employee who just returned from a leave of absence, where no similar rule was used against (nor did one previously exist or apply to) any other employee. In the same vein, it cannot offer any legitimate basis for placing Mr. Drizos on "heightened scrutiny" for investment fraud or embezzlement when its only apparent basis for doing so was the fear, stigma, and prejudice of alcoholism. And finally, it cannot justify a non-discriminatory need for Mr. Drizos to report his whereabouts to Rhome-Smith, who worked for an entirely different entity and had no formal supervisory authority over him.

A reasonable jury could conclude that the common thread was the fact that Mr. Drizos took leave for alcoholism, that his doing so caused personal and professional frustrations for O'Brien, and that she feared that his alcoholism might cause those frustrations to recur if he ever needed leave again. This inference is supported by the fact that O'Brien created a plan to divest Mr. Drizos of his clients if he ever went out on leave again *while he was away on the First Leave of Absence*, and then recruited and hired a financial advisor to be his replacement when he returned. This inference is furthered by the fact that the *day after* O'Brien learned that Mr. Drizos was seeking counselling again for his alcoholism in late January 2018, she attempted to divest him of his accounts out of fear that he would take another leave of absence but was stopped by human resources.

The factual record indeed establishes that O'Brien's greatest fear was whether Mr. Drizos would take another leave of absence. That fear drove her to create new, *ad hoc* procedures for him because of his disability, drove her to increase scrutiny and supervision over him because of his disability, and drove her to create and implement a plan to terminate him and divest him of all his accounts if he ever took leave again because of his disability. The factual record establishes the way in which this fear played out when Mr. Drizos told her that he intended to take another leave. She visibly showed her frustration and then ignored him completely, only to terminate him shortly thereafter. Of course, she also gave his book of business to the very person she recruited and hired to replace him once he was gone.

## III.   PNC Investments cannot establish that call-out procedures were an essential function of Mr. Drizos' position

Because the *ad hoc* call-out procedures never previously existed, were never applied to any other financial advisor, were not addressed in any job description (or related in any way to any job description) and were created only because Mr. Drizos took the First Leave of Absence, they cannot be deemed an essential function. PNC Investments relies on two medical cases in contending that physical presence at one of its branches is always an essential function of a financial advisor. *See e.g., Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 F. App'x 727, 729 (3d Cir. 2009) (finding attendance was an essential function of the job for employee whose job required her to assist during surgery); *Johnson v. Children's Hosp. of Phila.*, No. 94-5698, 1995

WL 338497, at *2 (E.D. Pa. June 5, 1995) (holding that plaintiff could not perform essential functions of his position as an aide in the radiology department when he frequently showed up to work late). This reliance is misplaced.

It is obvious that an essential function of a medical care position is being present to provide medical care. A surgical assistant must be present in the operating room to assist with surgery; a radiological aide must be present to assist with imaging. But Mr. Drizos was a financial advisor, not a medical care provider. And PNC Investments offers no evidence that attendance at the either branch (because Mr. Drizos worked at two branches, even though PNC Investments focuses on only one branch) was an essential function of his position. Mr. Drizos, however, provides substantial evidence that it was not, including specifically before his First Leave of Absence, where he was regularly permitted to work from home without adhering to attendance-related standards.

Third Circuit case law makes clear that attendance *can* be, but is not always, an essential function, which generally raises a factual question for trial. *See e.g., Flory v. Pinnacle Health Hosps.*, 346 F. Appx. 872, 876 (3d Cir. 2009) (holding that unexcused absenteeism did not disqualify the employee where prior absences under various supervisors went undisciplined and performance was never significantly impacted by excessive absenteeism); *Smith v. Davis*, 248 F.3d 249, 251-52 (3d Cir. 2001) (holding that factual disputes at summary judgment precluded granting the

defendant summary judgment as to whether the plaintiff, an alcoholic, was unqualified due to excessive absenteeism); *Thompson v. AT&T Corp.*, 2006 WL 89931, at *5-6 (W.D. Pa. Jan. 12, 2006) (holding that sufficient evidence existed for a reasonable factfinder to conclude that the plaintiff was qualified to perform the essential functions of her job, despite numerous disciplines over excessive absenteeism).

## IV.   A reasonable jury could conclude that PNC Investments retaliated against Mr. Drizos (and otherwise failed to reasonably accommodate him)[5]

### A.   Mr. Drizos engaged in protected activity

PNC Investments argues that Mr. Drizos did not engage in protected activity when he told O'Brien in May and June of 2018 that he intended to take another leave of absence because these conversations were not "definitive leave requests." This is simply incorrect under FMLA regulations and well-established law in the Third Circuit. As described in detail above and throughout Mr. Drizos' Briefs, in May 2018, Mr. Drizos told O'Brien multiple times that he intended to take another leave of absence.  He also told her that he could not take this leave immediately because he needed to arrange for bed space in a treatment facility and to prepare his practice for his absence. Appx472 at ⁋ 54.  This notice was a request for reasonable

---

[5] Mr. Drizos incorporates and relies on his argument in his Principal Brief, as well the arguments throughout this Reply, with respect to his reasonable accommodation claim under the ADA and PHRA.

accommodation and an invocation of Mr. Drizos' rights under the FMLA, thereby entitling him to protection from retaliation under the ADA, PHRA, and FMLA.

Protected activity under the ADA and PHRA includes a request for reasonable accommodation. *Shellenberger v. Summit Bancorp, Inc*., 318 F.3d 183, 190 (3d Cir. 2003). Moreover, "[a] leave of absence for medical treatment may constitute a reasonable accommodation under the ADA." *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 701 (E.D. Pa. 2010). Mr. Drizos' request for a medical leave to treat his alcoholism constituted a request for reasonable accommodation which entitled him to protection under the ADA and PHRA's anti-retaliation provisions.

Mr. Drizos simply needed to notify PNC Investments that he might need to take leave for protection under the FMLA. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 at 303 (3d Cir. 2012); *see also* 29 C.F.R. § 825.303 ("[T]he employee need not expressly assert rights under the FMLA or even mention the FMLA. When an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA–protected leave, the employee must specifically reference *either* the qualifying reason for leave *or* the need for FMLA leave.") (*emphasis added*). The Third Circuit describes an employee's notice obligations as follows:

> In providing notice, the employee need not use any magic words. The critical question is how the information conveyed to the employer is reasonably interpreted. An employee who *does not cite to the FMLA or provide the exact dates or duration of the leave requested* nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA.

*Sarnowski v. Air Brooke Limousine, Inc*., 510 F.3d 398, 402-3. (3d Cir.2007) (*emphasis added*); see also *Lichtenstein*, *supra*. Moreover, "[h]ow the employee's notice is reasonably interpreted is generally a question of fact, not law." *Lichtenstein,* 691 F.3d at 303.

A reasonable jury could easily conclude that Mr. Drizos provided sufficient notice of his intent to take leave to invoke his FMLA rights. To be sure, on at least June 8, 2018, before PNC Investments terminated his employment, Mr. Drizos informed O'Brien that he intended to take a leave of absence to attend a residential alcohol rehabilitation program. This communication was clearly intended to express his desire to take another leave for his serious health condition. O'Brien knew that his previous leaves of absence for this condition had been covered by the FMLA. Under these circumstances, a factfinder could easily conclude that she should have understood that this leave request was covered by the FMLA.

PNC Investments simply misapprehends the law surrounding Mr. Drizos' leave request. In *Sarnowski*, the Third Circuit held that an employee who informed his employer that he might need medical treatment in the future had invoked his FMLA rights and was protected from retaliation:

> We have concluded that, when the facts are viewed in the light most favorable to Sarnowski, Air Brook had sufficient notice of Sarnowski's intent to take leave to bar Air Brook from interfering with Sarnowski's rights under the FMLA. Sarnowski, a man with chronic heart problems, had missed approximately six weeks of work for quintuple coronary artery bypass surgery. *He informed his supervisor of his need for monitoring and possible additional surgery. He was not certain that he would need surgery, but he conveyed what information he had and made it clear to his employer that his health problems were continuing.* Eight days later, Sarnowski was terminated. We conclude that, based on the factual record as related by Sarnowski, Air Brook had sufficient notice of Sarnowski's need for leave to satisfy the notice requirements of the FMLA.

(emphasis added). Likewise, PNC Investments was aware of Mr. Drizos' ongoing serious health condition and that he had required leave for it in the past. At a minimum, beginning in May 2018, he communicated to PNC Investments that his health problems were continuing and that he might need additional treatment. This alone was sufficient notice under the FMLA to entitle Mr. Drizos to protection from retaliation.

**B. A reasonable jury could conclude that PNC Investments terminated Mr. Drizos' employment in retaliation for requesting FMLA leave**

PNC Investments first argues that Mr. Drizos cannot establish a causal relationship between his requests for leave and his termination because he admits that he violated the alleged "call-out procedures" by working from home on June 25, 2018. PNC Investments' argument rests on the improper resolution of disputed facts in its favor. As explained in Mr. Drizos' Principal Brief, there are sufficient facts for a reasonable juror to conclude that this was not O'Brien's real reason for terminating him, but instead was a pretext for discrimination and/or retaliation.

PNC Investments' argument also presumes that the alleged rule he broke was not created and/or imposed on him for discriminatory or retaliatory reasons. As explained previously, a reasonable factfinder could conclude that the alleged "call-out procedure" was never applied to any other financial advisor and was imposed on him only after he disclosed his disability and used his FMLA leave to obtain treatment. If a jury were to conclude that PNC Investments imposed different standards of conduct on Mr. Drizos than on other financial advisors because of his protected status, then his failure to meet those standards could not be a legitimate justification for his termination.

Moreover, as explained in Mr. Drizos' Principal Brief, the FMLA specifically contemplates that an adverse employment action may involve multiple causes or "motivating factors." Thus, as to Mr. Drizos' FMLA claims, PNC Investments cannot rely on a single event to "break the chain of causation." Rather, if a jury were to conclude that O'Brien was motivated both by Mr. Drizos' failure to advise her that he was working from home on June 25, 2018, *and* by her desire to terminate him before he could formally request additional FMLA leave, then he could prevail on his FMLA claims notwithstanding his alleged "intervening workplace misconduct."

PNC Investments next argues that Mr. Drizos cannot establish temporal causation. First, this a misstatement of the facts. As explained above, Mr. Drizos told O'Brien that he needed and intended to take another leave of absence multiple times in May *__and__* June 2018. He formally (in his mind) notified her of his leave request on June 8, 2018, only eighteen days before his termination. A reasonable juror could conclude that during this time O'Brien was simply waiting for an excuse to terminate him.

More importantly, however, in retaliation cases, causation does not turn on temporal proximity. Recently, in *Kengerski v Harper,* this Court stated,

> . . . we note that the District Court's singular focus on temporal proximity does not necessarily answer whether he has provided 'sufficient [evidence] to raise the inference that [his] protected activity was the *likely*

> *reason* for the adverse [employment] action.'" *Carvalho-Grevious v. Delaware State Univ.,* 851 F.3d 249, 259 (3d Cir. 2017) (emphasis in original) (quotation and citation omitted). While a very long delay may "suggest[ ], by itself, no causality at all," *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 274, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (internal citations omitted), "[i]n the absence of ... temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action," *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

6 F.4th 531, 542 n.9 (3d Cir. 2021). Moreover, in *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 315 (W.D. Pa. 2020), the Third Circuit's approach to evaluating causation in retaliation cases was described as follows:

> The Third Circuit has cautioned that in viewing the record to determine whether causation can be gleaned from it as a whole, there are "no limits on what [the Court has] been willing to consider," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000), and the Court should use a "wider lens" and consider a broad array of circumstances to show causation. *Id.* at 284. For instance, such an inference may arise when an employer gives inconsistent reasons for termination, *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986), takes a series of seemingly benign actions that paved the way for an employee's termination, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997), or attempts to provoke the employee by continually disciplining him for minor matters and miscalculating the amount of time he worked, *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993).

*Id.* Applying this standard to *Thomas*, courts find that even though the defendant had "advance[d] record-supported arguments that its decisions as to the Plaintiff's employment were motivated by nothing other than the Plaintiff's objective unacceptable work performance," there were also "specific circumstances in the record . . . that could rationally suggest the involvement of retaliatory animus in the termination decision . . ." *Id.* It has been noted that summary judgment must be denied where a jury could find for either party. The same is at least true here where it is possible that a jury could find that O'Brien was motivated exclusively by Mr. Drizos' failure to inform her that he would be working from home, or that retaliatory animus was involved in the employment decision.

PNC Investments also relies on the District Court's incorrect description of the causation requirement of a retaliation claim, claiming that, "[h]ad [Drizos] gotten to the point of specifically requesting FMLA leave for a specified period of time, give [sic] PNC's history with him, there is no evidence that he would have been denied such leave." Doc. #25 at 53. First, as stated *supra*, this is an incorrect statement of what is required to legally request an accommodation or invoke FMLA rights. More importantly, however, whether PNC Investments' human resources department approved Mr. Drizos' prior FMLA leave or would have approved it again in the future has nothing to do with whether O'Brien terminated him to prevent him from taking additional leave.

A reasonable jury could conclude that O'Brien understood that Mr. Drizos was entitled to, and would receive, another medical leave of absence. A reasonable jury could also conclude that she felt inconvenienced by his prior absence and did not want him to take more leave. Thus, when he told her that he intended to do so as soon as he could arrange bed space in a treatment facility, she decided to terminate him before he could make these arrangements. This would constitute retaliation in violation of the ADA, PHRA and FMLA.

## V.   The record establishes that PNC Investments interfered with Mr. Drizos' FMLA leave by failing to make reasonable provisions to complete his work in his absence

PNC Investments argues that, as a matter of law, Mr. Drizos cannot establish that it interfered with his FMLA rights by failing to adequately cover his workload during his FMLA leave. It is unclear whether PNC Investments' position is that, as a matter of law, it had no obligation to cover his workload or that, as a matter of law, its efforts to do so were sufficient.  Summary judgment on this claim is improper either way.

The purpose of the FMLA is to "entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C.A. § 2601.  Mr. Drizos contends that his entitlement to leave included a requirement that PNC Investments make reasonable provisions for his federally mandated compliance

work to be completed in his absence, such as account reviews, which were regulated by two federal agencies. He claims that PNC Investments interfered with his leave by allowing his accounts to become delinquent during his leave, and then requiring him to work over a hundred hours of overtime as soon as he returned because of it. Deferring his work in this manner amounted to a denial of some, if not all, of Mr. Drizos' leave.[6]

In similar contexts, courts have held that an employer's failure to adjust an employee's workload to account for his or her protected leave rendered such leave "illusory." For example, the Seventh Circuit reversed summary judgment where an employee offered evidence that her employer required her to complete all the duties of a full-time bookkeeper while she was taking intermittent FMLA leave, stating, in part:

> There is evidence that, although the District was aware that certain bookkeeper functions were not being completed adequately while Ms. Lewis was taking intermittent FMLA leave, it made no effort to take adequate steps to assuage the impact of her intermittent leave on the District's operations. A reasonable jury could conclude that the District, instead of taking such steps, expected Ms. Lewis to complete all of the duties of a full-time bookkeeper while she was working (and being paid)

---

[6] Record evidence suggests that when an account became delinquent by more than 90 days, it was required to terminate its relationship with the client, but in this case, rather than terminate those client relationships or perform the reviews while Mr. Drizos was on leave, it simply allowed them to become delinquent and then pressured forced Mr. Drizos to bring them into compliance immediately upon his return.

on an essentially part-time basis. Arguably, when her periods of intermittent leave prevented her from timely completing all of the duties she had performed as a full-time bookkeeper, she was removed from her position. Viewed in this way, a reasonable jury could find that the FMLA leave granted to Ms. Lewis was illusory.

*Lewis v. Sch. Dist.* #70, 523 F.3d 730, 743 (7th Cir. 2008) (cited with approval by *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 274 (3d Cir. 2017)); *see also Wojan v. Alcon Lab'ys, Inc.,* No. 07-11544, 2008 WL 4279365, at *5 (E.D. Mich. Sept. 15, 2008) (denying summary judgment where employer refused to adjust employee's sales quota to account for her FMLA absence).

PNC Investments cites *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1305 (7th Cir. 2022) and *Kollstedt v. Princeton City Sch. Bd. of Educ.*, No. 1:08-CV-00822, 2011 WL 249496 (S.D. Ohio Jan. 26, 2011) for the proposition that its failure to review Mr. Drizos' accounts did not interfere with his FMLA leave. However, the circumstances in these cases are distinguishable from those presented here.  In *Anderson*, the plaintiff's argument was not that she returned from leave to a backlog of work, but that she was not assigned enough work or was assigned irrelevant "make-up work" when she returned from leave.  In *Kollstedt*, it was undisputed that the defendant attempted to have other employees perform the plaintiff's duties, and there was no evidence that the plaintiff was overwhelmed with work when she returned from leave. *Id*. at *4.

To the extent that PNC Investments acknowledges that it had a duty to make provisions for Mr. Drizos' workload while on leave and argues that it did so, this fact is in dispute.  O'Brien testified that she and three other Financial Advisers reviewed Mr. Drizos's accounts while he was on leave, <u>yet over the course of 90 days, only four accounts were reviewed</u>. Mr. Drizos even testified that he was not aware of O'Brien reviewing any of his accounts while he was out and that she had allowed more than 70 accounts to become delinquent. Should a jury resolve this factual dispute in Mr. Drizos' favor, it could conclude that PNC Investments failed to make adequate provisions to cover Mr. Drizos' duties while on leave and that this failure interfered with his entitlement to FMLA leave.

/s/Alec B. Wright, Esquire
Pa. ID No. 316657

Margaret S. Coleman, Esquire
Pa. ID No. 200975

O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorneys for Appellant

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32A</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6309 words excluding the parts of the brief exempted by Fed. R. App. P.32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2209) in font size 14, font style Times New Roman.

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

We certify that we are members in good standing of the bar of the U.S-. Court of Appeals for the Third Circuit.

## <u>CERTIFICATION OF TEXT OF E-BRIEF</u>

We certify that the text of the E-Brief and the text of the hard copies of appellant's brief are identical.

## <u>CERTIFICATION OF VIRUS CHECK</u>

We certify that a virus check was performed on the .PDF file of appellant's brief. The virus software used was McAfee LiveSafe Virus Scan.

Dated:  January 23, 2023          <u>/s/Alec B. Wright, Esquire</u>
                                              Pa. ID No. 316657

                                              <u>/s/Margaret S. Coleman, Esquire</u>
                                              Pa. ID No. 200975

                                              O'BRIEN COLEMAN & WRIGHT LLC
                                              116 Boulevard of the Allies
                                              Pittsburgh, PA  15222
                                              (412) 232-4400

                                              Attorneys for Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing **Appellant's Reply Brief** with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by the using the appellate CM/ECF System. Participants in the case are registered CM/ECF users and service will also be accomplished by the appellate CM/ECF system on January 23, 2023.

Esteban Shardonofsky, Esquire
Seyfarth Shaw, LLP
700 Milam Street, Suite 1400
Houston, TX  77002

Brandon L. Dixon, Esquire
Seyfarth Shaw, LLP
233 Wacker Drive, Suite 8000
Chicago, IL  60606

Dated January 23, 2023

/s/Alec B. Wright, Esquire
Pa. ID No. 316657

Margaret S. Coleman, Esquire
Pa. ID No. 200975

O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorneys for Appellant